Gaston, J.
 

 It is objected on the part of the appellant, that the court below erred in rejecting proper evidence, which was offered in his behalf. The case states, that, on the cross-examination of Jacob Cluck and Daniel Cluck, witnesses examined on the part of the State to prove the first marriage of the defendant, they were asked whether the prosecutor had not paid them for coming to this State as witnesses, to which question they replied, that he had not; and that afterwards the prisoner'called a witness and proposed to ask him whether the said Jacob and Daniel Cluck had not
 
 told Mm,
 
 that the prosecutor had paid them for coming to
 
 *353
 
 this State as witnesses.- This question was objected to, and the court sustained the objection. 'The case dóes not set forth for what purpose the question was asked, or on what ground it was overruled. If it was a proper question for any legitimate purpose, the refusal of the court to let it be proposed was error. It cannot be contended that the evidence offered was competent to establish the fact that the witnesses had .been paid by the prosecutor; for that fact, if material, must be proved by persons, testifying under the sanction of an oath, and subject to cross examination, and could not be established by the declarations of one, not a parly nor a privy to the canse. But it is' insisted that the evidence was receivable, as having a tendency to effect the credit of those witnesses, because it shewed that-,'as
 
 tú this
 
 fact, they had given, when not on oath,-a different representation from that to which they had deposed on the trial. If the fact, in ralation, to which these inconsistent representations were alleged to have been made, had been one constituting a part of the evidence of the witnesses, upon the transaction under investigation, we should not hesitate in holding, that it was competent to attack the credit' of the witnesses by testimony of the kind offered. It is well settled, that the credit of a witness may be impeached by proof that he has made representations inconsistent with his present testimony, and whenever these representations respect the subject matter, in regard to which he is examined, it never has been usual with us to inquire of the witness, before offering the disparaging testimony,- whether he has or has not made such representations. But with respect to the collateral parts of the witness’ evidence, drawn out by cross-examination, the practice has been to regard the answers of the witness as conclusive, and the party so cross-examined shall not be permitted to contradict him. Of late, however, it is understood that this rule does not apply in all its rigour, when the cross-examination is as to matters which, although collateral, tend to shew the temper, disposition or conduct of the witness in relation to the cause or the parties. His answers as to these matters are not to be deemed conclusive, and may be contradicted by the interrogator — and, in this
 
 *354
 
 class, we think, may be included the enquiry, whether the witnesses have been paid by the prosecutor for their attend-anee. Sri the court below thought, and therefore did re-cejve evidence of the witness,-who was subsequently offered for this purpose. But the testimony rejected was
 
 not
 
 offered to
 
 contradict
 
 what the witnesses had deposed. Had these witnesses been asked whether they had made the representations attributed to them, and on being so asked had denied the fact, then the representations might have been proved upon them, and the effect of this contradiction upon their credit would have been a fit matter to be weighed by the jury. But we hold it to be unfair to attack the credit of a witness, by shewing that his answer, extracted by cross-examination, on an enquiry of this character, does not correspond with some statement previously made, without first drawing his attention to such supposed statement, so as to revive his recollection thereof and afford him an opportunity, if he remembers or admits it, of giving it fully, with such explanations as the circumstances may justify. With respect to the subject matter of the witness’ evidence, he may be presumed to come prepared to testify with a freshened memory and carefully directed attention — 4rut this presumption does not exist as to collateral matters, remotely connected with that subject matter; and justice to the witness, and still more, reverence for truth requires, that, before he be subjected' to the suspicion of perjury, he shall have a chance of awaken in 2: such impress ions in respect thereof as may be then dormant in his memory. We hold, therefore, that the court did
 
 not
 
 err in rejecting this testimony. It is further objected, that the defendant proposed to prove by his second wife, that his marriage with her had not been consummated by carnal knowledge of her body, and that the court rejected this testimony. Th'e ground on which the court below placed the rejection of this testimony, was, because the defendant, by calling her as a witness, admitted that she was not his wife; and by that admission, inasmuch as the fact of the second marriage had been established, he necessarily admitted the validity of the first marriage, and of consequence the crime wherewith he was charged. We are
 
 *355
 
 not satisfied that this ground can be sustained, on an indictment for bigamy. The second wife, it seems, is a witness either for or against her husband, simply because such second marriage is
 
 ipso facto
 
 void. Buller's N. P. 286-7. Unquestionably she is admissible as a witness against him, l Hale’s P. C. 693,66'i,and it is believed to be a settled principle, that whenever husband and wife are admissible witnesses against each other, they are also admissible for each other.
 
 Rex v Sergeant
 
 &
 
 others,
 
 Ryan & Moody 352 (21 E. C. L. R. 453.) There are certainly cases, where the fact of a .second marriage being had, living a former wife or husband, does not constitute the crime of bigamy. Our statute, defining the crime and declaring the punishment thereof, provides, that it shall not extend to any person, whose husband or wife shall continually remain beyond sea for the space of seven years together, nor to any person whose husband or wife shall absent him or herself in any other manner for the space of seven years together, such person not knowing his or her husband or wife to be living within the time. In neither of these excepted cases can the husband or wife be (-prosecuted for the second marriage, yet that second marriage is absolutely void. An admission of the invalidity of the second marriage is not therefore a necessary admission of .guilt. But we hold, that the testimony offered was properly •rejected, because the fact, proposed to be established by it, yras wholly irrelevant. The crime, in the language of our act, was completed, when
 
 “
 
 any person, now married, or who shall be hereafter married, doth take to him or herself another husband or wife, while his o.r her former wife or husband is still alive”—and there can be no question but that this is done, when the parties before the authorized minister declare that they there take each other for man and wife.
 
 Consensus non concubitus facit nuptias.
 
 Marriage., or the relation of husband and wife, is in law complete, when parties, able to contract and willing to contract, actually have contracted to be man and wife in the forms and with the solemnities required by law. It is marriage—it is this contract, which gives to each right or power over the body of the •other, and renders a consequent cohabitation lawful. And
 
 *356
 
 it js the ahnse 0f this formal and solemn contract, by enter-ing,“‘° ^ a secon<i time, when a former husband of wife is yet living, which the law forbids because of its outrage upon puhlic decency, its violation of the public economy, as well as its tendency to ch.eat one into a surrender of the person under the appearance of right. A man takes a wife lawfully, when the contract is lawfully
 
 made. He takes a wile
 
 unlawfully, when the contract is unlawfully made — and thi? unlawful contract the law punishes. It is also objected, on the partpf the prisoner, that improper evidence was received against him.’ In the first place, he objects to all the evidence received, tending to establish that a marriage, contracted in Tennessee, with the forms and solemnities described by the witnesses as accompanying that with his
 
 former wife,
 
 was a valid marriage, according to the laws of that State, if we were to give this objection all the effect claimed by it, and to admit that the v/hole of this testimony was improperly received, yet the defendant yroultj derive ho benefit therefrom. The marriage was solemnized in the manner prescribed b.y the laws of this State, and, until the contrary appears, we must understand that a marriage, so solemnized, would be good wherever celebrated. But besides it was solemnized according to the laws existing when Tennessee constituted a part of this State, laws which still exist here, and which must yet exist there, unless they have been repealed or modified by subsequent legislation.
 
 We
 
 know judicially, because it is a part of the public law
 
 oí
 
 this State, that the State of Tennessee was
 
 once
 
 a
 
 territory within
 
 the limits
 
 oí
 
 this State, and in the year 1789 was ceded to the United States, upon an express stipulation, that the laws in force and use in the State of North Carolina, at that time, should be and. continue in full force, within the territory thereby ceded? until the same should be repealed or otherwise altered by the legislative authority thereof — (see act of cession, Rev. Code ch. 299*) We must presume the continued existence of this law, until the contrary is shewn. But the.rc is no doubt entertained, upon the questions raised with respect to the re: ception of the certified copy of the law of Tennessee from the Secretary’s office. It is enacted that “in all suits, wherein
 
 *357
 
 it may be necessary for the decision of the case, to produce in evidence the law of any of our sister States, it shall and may be lawful for either party to produce in court a copy of the law of sueh State, drawn off by the Secretary of our State, from the copy of the laws of our sister State,deposited in his or the executive office, certified under his hand with the seal of the State of North Carolina attached, and it shall be his duty to furnish said copy when required, and such copy, thus attested, shall be held and deemed sufficient evidence of the existence of such law.” f-Rev. Stat. c’h. 44, sec. 3.) It is admitted that the
 
 certificate
 
 accompanying the copy of the law of Tennessee from the Secretary’s" office, was in all respects full and in due form. But it is contended, that the act referred to authorizes the production of such copies, as evidence in
 
 civil
 
 suits
 
 only,
 
 and not in pleas of the State; and further, that on an inspection of the copy certified by the Secretary, it was apparent that the.same was not a full copy. Now it cannot be denied, that the words of the act all suits wherein it may be necessary for the decision of the case to produce in evidence the law of a sister State” are sufficiently broad to take in criminal prosecutions as well as civil actions. Nevertheless as it is possible that these terms may have been used with reference to cases of the latter description only, we should not hesitate so to construe .the act, if any sufficient reason were offered, for assigning to it this restricted meaning. But instead of this, we have strong grounds for believing that it was with a special view to criminal prosecutions the act was passed. It was first enacted at the session of our Legislature, in December 1823, and the avowed purpose of its enactment was to correct an inconvenience, which had been proclaimed by this court at the prceding term in a criminal prosecution. The court-there reversed the judgment rendered below against one indicted for passing counterfeit money, purporting to have been issued by the bank of another State, because the statute book of that State had been received as evidence on the trial to prove the law establishing the Bank.
 
 State
 
 v
 
 Twitty,
 
 2 Hawks, 441. Besides, the act of 1823, by its second section, provided, that the Secretary should receive fees from'
 
 *358
 
 the Treasurer of the State “for all copies thus furnished lor ^e use ^ •A-itorney General -or Solicitor of the State in any suit in which the State may be party” — and, ever since t[je aüt 0f J823 down to this day, copies of laws so certified have been received on trials of pleas of the State without a question or doubt o.f their admissibility. The Revised Statutes of 1837 re-enact the whole of the act of 1823 — giving the first section of it
 
 verbatim,
 
 in chapter 44, sect. 3, and the second section substantially in chapter 105, sect. 13. We have no doubt that the act of -1823 received a proper construction, and that the act on the same subject in the same terms in the Revised Statutes should receive the same construction. The other ground on which the prisoner’s counsel .contends that the certified copy of the Tennessee law -was improperly received, viz: that on inspection it appears not to be a full copy of the law, is, we think, founded in a misapprehension. The 'law, whereof a copy is requested to be certified, is the law of Tennessee. All of
 
 that law
 
 is certified, beginning with those parts of the statutes of North Carolina which were in force when Tennessee was ceded, and going down to the latest legislation on that subject. What would seem to be omitted — are the sections of the North Carolina Statutes, which had been repealed before Tennessee was ceded. It may be added on this head, that if the certified copy of the Tennessee law was properly received in evidence, it becomes unnecessary to enquire, whether the testimony of the witnesses on that point was admissible. Itoould do the prisoner no injury.
 

 The remaining -part of the evidence, alleged to have been improperly received against the defendant, is to be found in that part of the-case, which states, that the prosecuting officer in cross-examining a witness for the prisoner, was permitted to ask him, in relation to his peregrinations between this State and Tennessee, whether he had not selected the night as the most opportune season for commencing his journies — notwithstanding this question was objected to by the prisoner’s counsel, because of its tendency to,.disparage the witness. Now it has certainly been much disputed how far a witness shall be compelled to answer questions which,
 
 *359
 
 without charging him with crimes, have a tendency to his disparagement or disgrace, and, although we believe that the weight of authority is that the witness may be compelled to answer such questions, we feel that the subject is not free from difficulty. But we understand, that there is tío doubt but that such questions may he rightfully asked; and the only doubt is, whether, when they are so asked, the witness may decline to answer them, (see the cases referred to 1 Star, on Ev. note to 172.) We hold, therefore, this objection, unsupported. An exception was also taken, because of an alleged misdirection of the jury on the subject of a vari-anee between the name of the lawful wife, as stated in the indictment, and her true name, as proved by the witnesses. It is charged in the indictment, that the defendant married one Deadema Kidwell, spinster, and that, afterwards, and while the said Deadema was alive, he took to wife one Leah Carter. The court instructed the jury that, if, upon the testimony of the witnesses, they should believe the Christian name of the first wife was Diadema, there was not a fatal variance between the indictment and the proof, and the defendant might be convicted as charged. It is a great rule of evidence that the proofs should correspond with the allegations, and where persons are described by name simply, in the allegations, evidence in relation to persons of different names cannot be considered as applicable to those so described. But it is also well established, that a name, merely misspelled, is, nevertheless, the same name. Now, as names are to a great extent arbitrary, and to that extent are distinguishable from each other only by the combinations of the letters or syllables whereof they are composed, it becomes a difficult matter to fix the-line, which separates the cases of mistake in spelling the same name, from those variations in spelling, which constitute different names. The nearest approach to it is to be found in the rule of
 
 idem sonans,
 
 that those names shall be considered identical which sound alike. Instances of the application of this rule are, of Segrave for Seagrave (
 
 Williams
 
 v
 
 Ogle, 2
 
 Str. 889.) Benedetto for Beneditto,
 
 (Abuthol
 
 v
 
 Beneditto, 2
 
 Taun. 401.) Whineyard for Winyard,
 
 (Rex
 
 v
 
 Foster,
 
 R. & R. 412)—
 
 *360
 
 and of Anny for Anne,
 
 Stale
 
 v
 
 Upton,
 
 1 Dev. 513. The variance here objected seems to us not greater than those, which in some of the cases referred to were held to be immaterial, and to amount to no more than misprisions in spelling. We cannot doubt but that Deadema and Diadema Kidwell are ope and the same person,' and therefore- we hold this direction of the Judge not erroneous. We deem it unnecessary to take particular notice of the other matters of exception raised upon the record. They are clearly untenable. It must be certified to the court that there is no error in their proceedings, and they must be directed to go on to sentence.
 

 Per Curiam, Ordered accordingly.