STATE OF NORTH CAROLINA v. JOHN RICHARD STEGMANN

No. 38

(Filed 14 April 1975)

1. **Criminal Law § 89— qualification of character witness — testimony as to general reputation permissible**

It is the general rule in this State that a sustaining or impeaching character witness must first qualify himself by indicating whether he knows the general reputation or character of the person, and when thus qualified, the character witness may then indicate, of his own accord or by prompting from counsel, what that general reputation is.

State v. Stegmann

2. **Criminal Law § 89; Rape § 4— character witness — basis of opinions questioned**

    The district attorney's question put to witnesses who had testified as to the prosecuting witness's general reputation and character, "On what do you base your opinion?" though unnecessary and ineptly phrased, together with the answers thereto tended to show the foundation for the character evidence given by the witnesses, aided the jury in determining the weight to be given the testimony, and was not prejudicial to defendant.

3. **Criminal Law § 89; Rape § 4— prosecuting witness in rape case — veracity questioned — character evidence proper**

    Where defense counsel in a rape case attempted to elicit testimony from the prosecuting witness tending to show that she consented to the intercourse and fabricated the alleged rape because she was afraid her husband would learn the truth concerning her rendezvous with defendant, the district attorney was entitled, while making out the State's case in chief, to offer evidence of her good character and reputation to sustain and strengthen her veracity and virtue.

4. **Criminal Law § 89; Rape § 4— prosecuting witness in rape case — character witnesses — evidence admissible**

    Testimony of witnesses in a rape case which indicated that the witnesses were in positions to observe the prosecuting witness and to gain knowledge of her general reputation in the community from those knowledgeable of that reputation was admissible, together with the length of time each witness had known the prosecuting witness, to show the foundation for their estimate of her character; the fact that several of the witnesses attended the same church as the prosecuting witness and based their testimony on what had been heard in the church community did not render the testimony inadmissible.

5. **Criminal Law § 34— defendant's guilt of prior rape — admissibility for identification and corroboration**

    In a rape prosecution the trial court did not err in allowing the prosecuting witness to testify that defendant told her he had previously been charged with rape but had "beaten the rap," in allowing officers to testify that they had reviewed their files as a result of the prosecuting witness's statements to them concerning the earlier rape, in allowing defendant to be cross-examined concerning the rape, and in allowing the district attorney to argue the matter before the jury, since such evidence was admissible to identify defendant as the perpetrator of the offense in question and to corroborate the testimony of the prosecuting witness.

6. **Criminal Law § 102— district attorney's jury argument — reason for failure to introduce evidence**

    In a prosecution for rape where defense counsel repeatedly argued to the jury that there was no evidence that defendant was arrested for rape on an earlier occasion, just accusations, the trial court did not err in allowing the district attorney's response indicating why he had not introduced such evidence.

**7. Criminal Law § 102— argument of prosecutor — latitude**

The prosecutor is entitled to argue to the jury the law and the facts in evidence and all reasonable inferences to be drawn therefrom, but he may not place before the jury incompetent, irrelevant and prejudicial matters, and may not travel outside the record by injecting into his argument facts of his own knowledge or other facts not included in the evidence; moreover, the fact that the sympathy or prejudice of the jury may be aroused by the argument of counsel does not render the argument improper when it is legitimate and based on competent evidence.

**8. Criminal Law § 89; Rape § 4— character witness — information about employment properly excluded**

In a rape case where a witness testified as to the character and reputation of the prosecuting witness and further testified on cross-examination that he was a special investigator with an intelligence unit, the trial court did not err in refusing to require the witness to divulge details concerning the type of work involved or the identity of his employer.

**9. Constitutional Law § 36; Rape § 7— death sentence — constitutionality**

Death sentence imposed in this rape case was constitutional.

Chief Justice SHARP and Justice COPELAND dissenting as to death sentence.

Justice EXUM dissenting.

APPEAL by defendant from judgments of *Canaday, J.,* 13 May 1974 Criminal Session, CUMBERLAND Superior Court.

Defendant was tried upon bills of indictment proper in form charging him with (1) kidnapping and (2) raping Ruth O'Leta Kendall on 4 September 1973 in Cumberland County.

Ruth O'Leta Kendall, a twenty-six-year-old married woman, testified that on 4 September 1973 she worked her normal hours of 8:30 a.m. to 5:00 p.m. at the Aetna Finance Company office located in the K-Mart Shopping Center on Bragg Boulevard in Fayetteville. Upon leaving work about 5:15 p.m., she made a few purchases in the grocery store, returned to her car, unlocked and opened the door on the driver's side, and sat down on the seat with her right leg in the car and her left foot and leg outside. The right door to the car was locked and could only be unlocked from the outside because the plastic button on the inside was broken off. While in that position and in the act of placing her groceries on the seat, a man shoved a knife in her ribs and told her to move over. "He told me to keep quiet

State v. Stegmann

and move over or he would use the knife. That if I did keep quiet he wouldn't hurt me."

Mrs. Kendall further testified that she moved over and the man got under the wheel. He required her to keep her hands on her lap while he kept his right arm around her with the knife to her side. It was a straight shift car which he steered with his left hand while she, at his command, changed gears as necessary. The man took her out Bragg Boulevard and into a remote section of Clark's Park where he stopped the car. He then forced Mrs. Kendall to accompany him on foot into the woods. There, after forcing her to disrobe, he raped her.

After putting on their clothes, Mrs. Kendall inquired if she would be taken back to the K-Mart and the man said, "I can't let you live because you can recognize me," adding that rape was a capital offense and that he couldn't afford to go through that. He told Mrs. Kendall he had been tried for rape in 1971 and "beat the rap" and couldn't go through that again. He told her he had spent time in jail and in a mental hospital; that he had children he had to support; that she could identify him by his tattoos. Mrs. Kendall observed that the man's front teeth were missing and that a tattoo on his left forearm said "God Bless My Family" and had four names, including the name Sharon. On his right upper arm was an Airborne-type tattoo. He was wearing a T-shirt, fatigue pants, and combat boots. The man pushed Mrs. Kendall through the underbrush until they came to the Cape Fear River. He asked her if she could swim and told her to choose between the knife and the river. She started for the river and he pulled her back and eventually took her back to the car.

On the way back to K-Mart he wanted to know her name and she told him. He said he wanted her telephone number, and Mrs. Kendall wrote it on a piece of paper and gave it to him. He told her that he wanted to have an affair with her—"he wanted to call me up and meet me later. I told him that I would do anything he wanted; he still had the knife and I was still petrified."

Upon arrival at the K-Mart parking lot the man talked to Mrs. Kendall for an additional ten or fifteen minutes, then got out of the car and told her to go straight home and not look back. Mrs. Kendall drove away and noticed a white car following her until she turned into the street where she lived.

State v. Stegmann

Mrs. Kendall immediately told her husband what had occurred. Her clothes were dirty and wet and had mud, debris and pine straw on them. The family doctor was called and the police were notified.

When the police arrived at her home she told them the whole story and gave a description of the man including information about the tattoos, the two missing front teeth, and the color of his hair. She also told the officers that her assailant said "he had beat a case like this in '71 where he had assaulted another lady and that he had spent time in jail and that he had spent time in a mental hospital."

The officers consulted their files and ascertained that the defendant John Richard Stegmann fit, *in minute detail*, the description given by Mrs. Kendall. The police records further showed that defendant had been charged with rape in 1971 and acquitted.

Defendant was arrested and on the following day Mrs. Kendall identified him in a lineup.

Defendant offered evidence and testified as a witness in his own behalf. He said he was twenty-four years old, married, and had three children named Johnny, Donny and Sharon. He testified he first met Mrs. Kendall in the K-Mart Snack Bar approximately two weeks before he was arrested. The place was crowded and he asked Mrs. Kendall if he might sit at her table where she was eating lunch and she consented. He introduced himself and she told him her name. He told her he was in the Army, married and had children. He asked her for her telephone number and she gave it to him there in the K-Mart Snack Bar. The number was 867-1700 and he put it in his wallet. On 3 September 1973 he called Mrs. Kendall and in a one-minute conversation they agreed to meet the following day when she got off work. Accordingly, he met her on 4 September 1973 as she came out of the grocery store at the K-Mart Shopping Center. "I walked over to her and took the bags she was carrying and carried them to her car. She then got into her car and I got in, too, and I drove away."

The defendant further testified that they drove to Clark's Park, went down the path that leads to the river to an area in the woods where they undressed and had sexual relations. It was drizzling at the time. While undressing "everything fell out of one of the pockets in my pants," including the knife offered

State v. Stegmann

in evidence, and Mrs. Kendall helped pick the items up. Defendant said he and Mrs. Kendall then dressed and drove back to the K-Mart Shopping Center where they sat and talked for fifteen or twenty minutes. "I then got out of the car and left. She drove off."

Defendant emphatically denied that his small pocket knife was ever open, or that he ever threatened Mrs. Kendall, or that he ever told her he had been previously charged with rape in 1971 and beat the rap. He admitted that his front teeth are missing and that he has tattoos on both arms, one an Airborne-type tattoo and the other with "God Bless My Family" and four names on it—Sandra, Sharon, Johnny and Donny.

Dr. Albert Stewart, Jr., testified that he saw Mrs. Kendall on 4 September 1973 at which time she told him she had been raped. She appeared to be frightened but there was no evidence of any bodily injury. Examination disclosed twigs, bits of debris, leaves and dirt adhering to her back and in the vaginal area. There were no scratches, cuts or bruises on her body and examination of her privates revealed no cuts or bruises or lacerations of any kind.

The arguments were transcribed and constitute part of the record on appeal. Pertinent portions of the district attorney's argument which are assigned as error will be narrated in the opinion.

Defendant was convicted of both charges and appeals from a life sentence for the kidnapping and a death sentence for the rape.

*Kenneth Glusman, attorney for defendant appellant.*

*James H. Carson, Jr., Attorney General, and James E. Magner, Jr., Assistant Attorney General, for the State of North Carolina.*

HUSKINS, Justice.

The trial court admitted over objection the testimony of fourteen character witnesses offered by the State to show the good character and reputation of the prosecuting witness. Defendant's second and third assignments of error are based upon admission of this testimony. Following is a brief narration of the evidence in question.

Roger Frazee, manager of Aetna Finance Company where Mrs. Ruth Kendall had been working for fourteen months, testified that he knew her character and reputation in the community in which she lived and that it was outstanding.

Gilda Smith testified she had known Ruth Kendall for over four years, knew her character and reputation in the community in which she lived and that it was "very good, excellent."

Reverend Clarence L. Hopkins testified he had known Ruth Kendall for about ten years, knew her character and reputation in the community in which she lived, and that it was outstanding. When asked to state on what he based his opinion, he replied: "As a pastor and counseling with other members of the church and their counseling with me and statements made about her and also in and out of the church I knew her."

Major Darryl C. Judson testified he had known Ruth Kendall for about eight years, knew her character and reputation in the community in which she lived, and that it was outstanding. When requested to state the basis for his answer, he replied: "I base this upon personal observation, talking with friends and conversation with other people and upon my own seeing what she has done on her courage and her integrity."

Will R. Godwin testified he had known Ruth Kendall for ten or twelve years, knew her character and reputation in the community in which she lived, and that it was very good. When asked to state the basis for his testimony, he replied: "I am her Sunday School teacher and I am the director of the choir in which she sings. She is there every Wednesday night and every Sunday and I can find nothing wrong with her whatsoever. She is a very fine girl."

Eugene Arthur Ledbetter, a soldier in the United States Army, testified he had known Ruth Kendall between ten and twelve years, knew her character and reputation in the community in which she lived, and that it was excellent. When asked to state the basis for that opinion, he replied: "I base this on my own personal observation and discussions with other church leaders regarding positions of leadership that have been filled with the church and I know her reputation as being the finest a woman can have."

Pansy Cain Porter testified she had known Ruth Kendell approximately twelve years, knew her character and reputation

---

State v. Stegmann

---

in the community in which she lived, and that it was outstanding. When asked what she based that opinion on, she replied: "I have been knowing her approximately twelve years and personal contact. And working with her in the church and choir."

Roy A. Parker testified that he knew Ruth Kendall; that her character and reputation in the community in which she lived was very good and that he based his opinion upon talking with his friends and neighbors in the church and in the community and as a personal observation.

Mitchell Reinburger testified that he knew the character and reputation of the prosecuting witness in the community in which she lived and that it was outstanding; that his opinion was based on his personal knowledge of her and the opinions of his friends.

Catherine Reinburger testified that she knew the character and reputation of Ruth Kendall in the community in which she lived and that it was excellent; that her opinion was based on the fact that she had known Mrs. Kendall for three and one-half years, had been involved in activities with her and her husband, and from talking with friends and acquaintances.

Ann Riggin testified that she knew the character and reputation of Ruth Kendall in the community in which she lived and that it was excellent; that her opinion was based on living in the community with her when she was growing up, going to church with her, and having Mrs. Kendall in her home at Christmas time.

Tony Cimaglia testified that he knew the general character and reputation of the prosecuting witness in the community in which she lived and that it was very good; that his opinion was based on being with Mrs. Kendall and her husband on numerous occasions and through friends in the community and from knowing her personally.

Aldan Ernest Pease testified that he knew the character and reputation of Mrs. Kendall in the community in which she lived and that it was outstanding; that his opinion was based on his personal acquaintance with Ruth Kendall and her husband "and through personal acquaintances with neighbors and church members."

Mrs. Roland Harris, Jr., testified that she knew the general character and reputation of the prosecuting witness in the com-

munity in which she lived and that it was good; that her opinion was based on her own personal observation. "The witness testified that the prosecuting witness and her husband had been in the witness' home several times during the time they were dating and since then and the witness further testified that in her opinion the prosecuting witness is a fine Christian girl."

[1]· It is the general rule in this State that a sustaining or impeaching character witness must first qualify himself by indicating whether he knows the general reputation or character of the person. *Johnson v. Massengill,* 280 N.C. 376, 186 S.E. 2d 168 (1972); *State v. Ellis,* 243 N.C. 142, 90 S.E. 2d 225 (1955); *State v. Bowen,* 226 N.C. 601, 39 S.E. 2d 740 (1946); *State v. Colson,* 193 N.C. 236, 136 S.E. 730 (1927); *State v. Steen,* 185 N.C. 768, 117 S.E. 793 (1923); 1 Stansbury's North Carolina Evidence, § 114 (Brandis Rev. 1973).

When thus qualified, the character witness may then indicate, of his own accord or by prompting from counsel, what that general reputation is. *State v. Smoak,* 213 N.C. 79, 195 S.E. 72 (1938); *State v. Sentelle,* 212 N.C. 386, 193 S.E. 405 (1937); *State v. Nance,* 195 N.C. 47, 141 S.E. 468 (1928); *Edwards v. Price,* 162 N.C. 243, 78 S.E. 145 (1913); *State v. Ussery,* 118 N.C. 1177, 24 S.E. 414 (1896).

Chief Justice Stacy in *State v. Hicks,* 200 N.C. 539, 157 S.E. 851 (1931), states the rule for qualifying a character witness and eliciting character testimony from him in these words:

"The rule is, that when an impeaching or sustaining character witness is called, he should first be asked whether he knows the general reputation and character of the witness or party about which he proposes to testify. This is a preliminary qualifying question which should be answered yes or no. If the witness answer it in the negative, he should be stood aside without further examination. If he reply in the affirmative, thus qualifying himself to speak on the subject of *general* reputation and character, counsel may then ask him to state what it is. This he may do categorically, *i.e.* simply saying that is good or bad, without more, or he may, of his own volition, but without suggestion from counsel offering the witness, amplify or qualify his testimony, by adding that it is good for certain virtues or bad for certain vices."

[2] This procedure was followed in the examination of witnesses Roger Frazee and Gilda Smith. In the examination of the remaining twelve witnesses, however, the district attorney added the question: "On what do you base your opinion?" Defendant contends this question spawned expressions of personal opinions and narrations of specific acts relating to Ruth Kendall's good character in violation of the rule that character may not be shown by the opinion of the character witness or by specific acts of the person whose character is in question. *See Johnson v. Massengill,* 280 N.C. 376, 186 S.E. 2d 168 (1972).

Although unnecessary and ineptly phrased, the additional question and the answers thereto tended to show the foundation for the character evidence given by the witnesses. A strong or weak foundation for the testimony of a witness aids the jury in determining the weight it will give that testimony. *State v. Young,* 210 N.C. 452, 187 S.E. 561 (1936); *Moss v. Knitting Mills,* 190 N.C. 644, 130 S.E. 635 (1925); 2 Wigmore, Evidence § 655 (3rd Ed. 1940). Thus the question was properly permitted, and we perceive no prejudice from either the question or the responses. *State v. Kiziah,* 217 N.C. 399, 8 S.E. 2d 474 (1940).

[3] In the cross-examination of Ruth Kendall, defense counsel attempted to elicit testimony tending to show that she consented to the intercourse with defendant and fabricated the alleged rape because she was afraid her husband would learn the truth concerning her rendezvous with defendant. The questions implied that Mrs. Kendall had willingly engaged in an adulterous act and then sought to conceal it by false testimony on direct examination. In that setting, the district attorney was entitled, while making out the State's case in chief, to offer evidence of her good character and reputation to sustain and strengthen her veracity and virtue. *Ingle v. Transfer Co.,* 271 N.C. 276, 156 S.E. 2d 265 (1967); *Lorbacher v. Talley,* 256 N.C. 258, 123 S.E. 2d 477 (1962); *State v. Hooks,* 228 N.C. 689, 47 S.E. 2d 234 (1948); *State v. Litteral,* 227 N.C. 527, 43 S.E. 2d 84, *cert. denied* 332 U.S. 764, 92 L.Ed. 349, 68 S.Ct. 69 (1947); *State v. Bethea,* 186 N.C. 22, 118 S.E. 800 (1923); 1 Jones on Evidence § 4:37 (6th Ed. 1972); 1 Stansbury's North Carolina Evidence § 50 (Brandis Rev. 1973); 4 Wigmore, Evidence § 1104 (Chadbourn Rev. 1972); 29 Am. Jur. 2d, Evidence § 342 (1967). Moreover, "the character of the complainant in rape may, it seems, be shown as bearing on the question of consent." 1 Stansbury's North Carolina Evidence § 105 (Brandis Rev. 1973); *State v. Grundler*

*and Jelly,* 251 N.C. 177, 111 S.E. 2d 1 (1959), *cert. denied* 362 U.S. 917, 4 L.Ed. 2d 738, 80 S.Ct. 670 (1960) ; *State v. Hairston,* 121 N.C. 579, 28 S.E. 492 (1897) ; *State v. Daniel,* 87 N.C. 507 (1882) ; *State v. Jefferson,* 28 N.C. 305 (1846). In every criminal prosecution a defendant may offer evidence of his good character and have it considered as substantive evidence in his favor. On the same theory, in a prosecution for rape, where the credibility of the prosecutrix is attacked either by evidence or by questions on cross-examination insinuating that she consented to sexual relations with the defendant, the State is entitled to offer evidence of the good character of the prosecutrix. The defense of consent is a charge that the prosecutrix has, under oath, falsely accused a man in a matter involving his life or death. The State, therefore, may put in evidence any circumstance tending to lessen the likelihood that she is guilty of such criminal and iniquitous conduct. *See* 1 Stanbury's North Carolina Evidence §§ 104 and 105 (Brandis Rev. 1973). In situations where the defendant does not question the fact of rape but denies that he is the guilty party, the character of the prosecutrix is not directly involved in the issue.

[4] We note that each character witness categorically stated that Ruth Kendall's character and reputation was "outstanding," "very good," or "excellent." Then in response to the additional question the witnesses indicated that their testimony was based on association, observation and discussion with Ruth Kendall and her associates. Eight of the witnesses (Hopkins, Judson, Ledbetter, Parker, Mitchell, Reinburger, Cimaglia and Pease) testified they had gained knowledge of Ruth Kendall's reputation through personal observation, and *by talking with church members, friends, neighbors, personal acquaintances, and other members of the community.* The testimony of each witness, when taken as a whole, indicates that the witness was in a position to observe Ruth Kendall and to gain knowledge of her general reputation in the community from those knowledgeable of that reputation. Such testimony, as well as the length of time each witness had known Ruth Kendall, was admissible to show the foundation for their estimate of her character. *State v. Carden,* 209 N.C. 404, 183 S.E. 898, *cert. denied* 298 U.S. 682, 80 L.Ed. 1402, 56 S.Ct. 960 (1936).

The fact that several of the witnesses attended the same church as Ruth Kendall and based their testimony on what had been heard in the church community did not render the testi-

mony inadmissible. Evidence of Ruth Kendall's general reputation among the members of the church community was competent. *State v. McEachern,* 283 N.C. 57, 194 S.E. 2d 787 (1973). And the number of character witnesses who were permitted to testify rested in the sound discretion of the trial court. *State v. Wright,* 274 N.C. 380, 163 S.E. 2d 897 (1968); *Wells v. Bissette,* 266 N.C. 774, 147 S.E. 2d 210 (1966); *see* Annot., Propriety and Prejudicial Effect of Trial Court's Limiting Number of Character or Reputation Witnesses, 17 A.L.R. 3d 327 (1968). The number permitted in this case by the trial judge is understandable since Mrs. Kendall's character was under attack.

Only the testimony of Mrs. Roland Harris, Jr., appears to be grounded solely on personal opinion and thus inadmissible. Error in admitting her testimony is harmless since Ruth Kendall's good reputation was well established by other admissible evidence. *State v. Killian,* 173 N.C. 792, 92 S.E. 499 (1917); *accord, United States v. Neff,* 343 F. Supp. 978 (E.D. Pa. 1972), *aff'd* 475 F. 2d 861 (3rd Cir. 1973). We conclude, for the reasons stated, that defendant's second and third assignments of error are without merit.

Assignments of error five, six and eleven assert error in the admission of evidence tending to show defendant had been arrested for rape in 1971. One question of law is presented under the three assignments, so we consider them together.

Ruth Kendall testified on direct examination that defendant told her "that he had had a lady in 1971 and that he had done the same thing to her that he had done to me and he had beat the rap, and that he had spent time in jail for it." When the police came to her home, she told them what defendant had said "concerning 1971." She said she did not know defendant's name at that time and the name Stegmann was not mentioned by anyone. Defendant made no objection and took no exception to the introduction of her testimony.

Defendant Stegmann took the stand and testified he did not tell Ruth Kendall that he had previously been charged with rape. On cross-examination he stated that Mrs. Kendall had lied about the statement.

On the direct examination of Deputy Sheriffs Conerly and Martin, the district attorney inquired whether the officers had reviewed their files as a result of Ruth Kendall's description of the suspect and the statement concerning his arrest for rape

State v. Stegmann

in 1971. The witnesses in substance testified that such a review was made and, as a result, the defendant's name was turned over to Detective Merritt of the Fayetteville City Police Department. Detective Merritt testified that he received defendant's name from the sheriff's department and that defendant was arrested. Objections and exceptions to the questioning and testimony of these witnesses constitutes defendant's fifth assignment of error.

In a series of questions propounded on cross-examination, the district attorney asked defendant, *inter alia,* whether he knew Diane Hoffman, whether he raped her in September 1971 and used a knife in the process, whether he had sexual intercourse with her, and whether he knew Officer House who was sitting in the courtroom. Defendant responded that he had known Diane Hoffman for approximately five or six hours and admitted having sexual intercourse with her. However, he denied using his knife and raping her. He stated that he knew Officer House. Objections and exceptions to these questions and testimony constitute defendant's sixth assignment of error.

During argument to the jury the district attorney recapitulated the above testimony, stating at one point that it showed the steps leading to the identification and apprehension of defendant. At another point in his argument he invited the jury to "draw the reasonable inferences" from it. Objections and exceptions to such argument constitutes defendant's eleventh assignment of error.

Defendant argues that one of the major thrusts of the State's case was directed towards proving and arguing that defendant had a prior arrest for rape. He contends such testimony and argument should have been excluded under authority of *State v. Williams,* 279 N.C. 663, 185 S.E. 2d 174 (1971).

In *Williams* the defendant was tried for robbery. On cross-examination he was asked whether he was *under indictment* for other unrelated robberies. Overruling a line of cases to the contrary, this Court held that *"for purposes of impeachment,* a witness, including the defendant in a criminal case, may *not* be cross-examined as to whether he has been *indicted* or is *under indictment* for a criminal offense other than that for which he is then on trial." The Court also held, *a fortiori,* that *"for purposes of impeachment,* a witness, including the defendant in a criminal case, may *not* be cross-examined as to whether he

has been *accused,* either informally or by affidavit on which a warrant is issued, of a criminal offense unrelated to the case on trial, nor cross-examined as to whether he has been *arrested for* such unrelated criminal offense." In conclusion, Chief Justice Bobbitt, writing for the Court, defined the limits of that decision:

> "We are not at present concerned with *the general rule* that, in a prosecution for a particular crime, the State cannot offer evidence tending to show that the accused has been convicted of another distinct, independent, or separate offense, nor with any of the *well recognized exceptions* to that rule. See *State v. McClain,* 240 N.C. 171, 81 S.E. 2d 364 (1954), and cases cited. Evidence which is admissible under any of the *well recognized exceptions* is admissible as substantive evidence. At present, we are concerned only with questions which are permissible on cross-examination solely *for purposes of impeachment.*

> "It is permissible, for purposes of impeachment, to cross-examine a witness, including the defendant in a criminal case, by asking disparaging questions concerning collateral matters relating to his criminal and degrading conduct. *State v. Patterson,* 24 N.C. 346 (1824) ; *State v. Davidson,* 67 N.C. 119 (1872) ; *State v. Ross,* 275 N.C. 550, 553, 169 S.E. 2d 875, 878 (1969). Such questions related to matters *within the knowledge of the witness,* not to accusations of any kind made by others. We do not undertake here to mark the limits of such cross-examination except to say generally (1) the scope thereof is subject to the discretion of the trial judge, and (2) the questions must be asked in good faith."

The *Williams* decision does not affect the general rule that in a prosecution for a particular crime the State cannot offer evidence tending to show the accused committed another distinct, independent or separate offense. See *State v. Jones,* 278 N.C. 88, 178 S.E. 2d 820 (1971) ; *State v. McClain,* 240 N.C. 171, 81 S.E. 2d 364 (1954). Nor does *Williams* displace the many recognized exceptions to that general rule. See *State v. McClain, supra; State v. Harris,* 223 N.C. 697, 28 S.E. 2d 232 (1943) ; *State v. Hight,* 150 N.C. 817, 63 S.E. 1043 (1909).

When the general rule excluding evidence of other offenses is stated in terms of relevancy of evidence, the rule becomes absolute. Professor Stansbury correctly states the rule as follows:

> "This is commonly supposed to be a somewhat difficult and complex field, marked out by a general rule of exclusion and a series of exceptions. It is submitted, however, that the rule is in fact a simple one which, when accurately stated, is subject to no exceptions: Evidence of other offenses is inadmissible on the issue of guilt if its only relevancy is to show the character of the accused or his disposition to commit an offense of the nature of the one charged; but if it tends to prove any other relevant fact it will not be excluded merely because it also shows him to have been guilty of an independent crime." 1 Stansbury's North Carolina Evidence § 91 (Brandis Rev. 1973); *accord, State v. Shutt,* 279 N.C. 689, 185 S.E. 2d 206 (1971), *cert. denied* 406 U.S. 928, 32 L.Ed. 2d 130, 92 S.Ct. 1805 (1972); *State v. McClain, supra* at 176-77, 81 S.E. 2d at 368 ("The acid test is its logical relevancy to the particular excepted purpose or purposes for which it is sought to be introduced," quoting *State v. Gregory,* 191 S.C. 212, 4 S.E. 2d 1).

[5] Under this rule evidence tending to show that defendant had been arrested for rape in 1971 is admissible if it is relevant to some legitimate issue in the trial other than defendant's character or disposition for crime. We find it admissible to show identification and to corroborate the testimony of Ruth Kendall.

Ruth Kendall testified defendant told her he had committed a similar act in 1971 for which he spent time in jail, but that he ultimately "beat the rap." The subsequent questioning and testimony of the officers and defendant, which tended to show that he had *in fact* been arrested for a similar incident, was obviously relevant to show that defendant was the person who had raped Ruth Kendall and made the statement concerning a similar offense in 1971. *State v. Perry,* 275 N.C. 565, 169 S.E. 2d 839 (1969); *see also State v. Shutt, supra; State v. Williams,* 276 N.C. 703, 174 S.E. 2d 503 (1970), *rev'd on other grounds* 403 U.S. 948, 29 L.Ed. 2d 860, 91 S.Ct. 2290 (1971), and cases cited therein.

Even so, defendant contends that the issue of identification was never really in issue since the defense was based on consent rather than misidentification. Nevertheless, his plea of not guilty

put in issue every material element of the State's charge against him. *State v. McWilliams,* 277 N.C. 680, 178 S.E. 2d 476 (1971) ; *State v. Courtney,* 248 N.C. 447, 103 S.E. 2d 861 (1958). Regardless of the development at the previous trial or defendant's testimony in the trial now under consideration, it was incumbent on the prosecution to prove that *defendant* committed the alleged crime. 65 Am. Jur. 2d, Rape § 53 (1972). The district attorney was not required to speculate as to possible defenses before defendant put on evidence.

Moreover, the evidence tended to confirm the statement that defendant had committed a similar offense in 1971 which would indicate that Ruth Kendall did not fabricate her testimony concerning the statement. The evidence strengthened what Ruth Kendall had said, and therefore was admissible for corroboration purposes. *See State v. Case,* 253 N.C. 130, 116 S.E. 2d 429 (1960), *cert. denied* 365 U.S. 830, 5 L.Ed. 2d 707, 81 S.Ct. 717 (1961) ; *State v. Lippard,* 223 N.C. 167, 25 S.E. 2d 594, *cert. denied* 320 U.S. 749, 88 L.Ed. 445, 64 S.Ct. 52 (1943) ; *State v. Morton,* 107 N.C. 890, 12 S.E. 112 (1890).

Even assuming *arguendo* that the evidence served no relevant purpose and was inadmissible, there was no prejudicial error. On both direct and cross-examination Ruth Kendall testified that defendant told her he had committed a similar offense and "beat the rap." Since defendant made no objection to her testimony, his subsequent objections to evidence of the same or like import were of no avail. *State v. Van Landingham,* 283 N.C. 589, 197 S.E. 2d 539 (1973) ; *State v. Davis,* 282 N.C. 107, 191 S.E. 2d 664 (1972) ; *State v. Jarrett,* 271 N.C. 576, 157 S.E. 2d 4 (1967) ; *State v. Wright,* 270 N.C. 158, 153 S.E. 2d 883 (1967). Assignments of error five, six and eleven are overruled.

Assignments of error eight and ten are directed to the district attorney's argument to the jury.

Assignment eight alleges error in the following portion of the argument, which reads :

"In criminal law we have certain rules, laws, statutes and all of these are designed to protect the rights of defendant. They have been brought about by custom from England, statutes that have been designed through history and building up to the present day, laws that we work with. Now under those rules of evidence, there is certain evidence that

can't be presented to you, for the protection of the defendant.

Now, that is just the law, yet, even in view of those rules and those laws, argument can be made to you, why wasn't this or that brought in. Now, that seems inconsistent to you but that is the law. I maybe could not present evidence, but the defense attorney can stand up and say why didn't we, when he knows that it was for the protection of his defendant, that evidence didn't come in, from some law—

ATTORNEY GLUSMAN: Objection. (The Judge is not in the Courtroom).

The law is clear and I can ask a defendant on cross examination about prior misconduct, specific instances, that is the law of the case, law in North Carolina. The law is equally clear that if the defendant denies that, I can't put on independent evidence of it.

ATTORNEY GLUSMAN: Objection."

Defendant's objections to this portion of the argument and a motion for mistrial grounded thereon were denied.

Numerous cases hold that the argument of counsel must be left largely to the control and discretion of the presiding judge and that counsel must be allowed wide latitude in the argument of hotly contested cases. *E.g. State v. Monk,* 286 N.C. 509, 212 S.E. 2d 125 (1975) ; *State v. Barefoot,* 241 N.C. 650, 86 S.E. 2d 424 (1955) ; *State v. Bowen,* 230 N.C. 710, 55 S.E. 2d 466 (1949) ; *State v. Little,* 228 N.C. 417, 45 S.E. 2d 542 (1947).

It is the duty of the prosecuting attorney in all phases of the trial to present the State's case with earnestness and vigor and to use every legitimate means to bring about a just conviction. *See State v. Monk, supra; State v. Westbrook,* 279 N.C. 18, 181 S.E. 2d 572 (1971), *vacated on other grounds,* 408 U.S. 939, 33 L.Ed. 2d 761, 92 S.Ct. 2873 (1972) ; 23A C.J.S., Criminal Law § 1081 (1961).

[6]   Such is the case here. Both counsel for defendant and the district attorney presented forceful arguments to the jury. Defense counsel repeatedly argued that there was *no evidence* that defendant was arrested for rape in 1971, *just accusations.* Defense counsel's remarks invited the district attorney's response indicating why he had not introduced such evidence. Although

we do not concede, as the district attorney apparently thought, that the stated rule precluded the actual introduction of such evidence for relevant purposes other than impeachment, we perceive no error in the trial court's ruling upon the district attorney's responsive argument. *State v. Seipel*, 252 N.C. 335, 113 S.E. 2d 432 (1960) ; *State v. Knotts*, 168 N.C. 173, 83 S.E. 972 (1914) ; 75 Am. Jur. 2d, Trial § 233 (1974). Defendant's eighth assignment is overruled.

Defendant's tenth assignment of error is also directed to portions of the district attorney's argument. Exceptions 58, 61-64 and 67 are grouped under this assignment and relate to the following excerpts from the argument:

"Very frankly, I want you to be bothered. I think we all are bothered by this. I think it is shocking. I think it is the most horrible thing that can happen to anybody in this world." Objection. Overruled. Exception No. 58.

\*    \*    \*    \*

"She has been accused of taking up with this stranger after a fifteen minute conversation and running off to the woods and having intercourse on a path, on a wet day, as a lark. I am not going to call the name that you would refer to, as to somebody that would do that, but you know what it is and that is what he is saying she did. She has been accused of being a liar. Her character has been assaulted in about the most lowly manner that can be done to anybody." Objection. Overruled. Exception No. 61.

"And I ask you—most of you men can probably not understand it, because you can't be placed in the woman's shoes, completely—but let me ask you, how would you feel if you were called the things in this Court—" Objection. Exception No. 62.

"—that she was called?" Objection. Overruled. Exception No. 63.

"And they said on top of all this, and this really tops it all, that she can just turn on and off the tears when she wants to. By gosh, after what she has gone through and what she was being called. And there is no protection from what is printed or what is published in a trial of a case. Everybody talks about it. But look what happened. She is scarred—not physically, there is no scarring on the outside,

but she is scarred mentally. She has got to live with it. She has got to live with this horrible experience the rest of her life." Objection. Overruled. Exception No. 64.

\*    \*    \*    \*

"The defendant Stegmann feels, as has been shown you, that he can force his way on any woman. He is going to do what he pleases, regardless of whose rights he violates. He is above the law and that is the way he sits here right now, 'I am above the law. I am going to thumb my nose at you.'" Objection.

"COURT: Proceed to some other form of argument, Mr. District Attorney." Exception No. 67.

In presenting the State's case, the prosecutor must "show the whole transaction as it was." He has much latitude in the language and manner of presenting his side of the case "consistent with the facts in evidence." *State v. Westbrook, supra;* 23A C.J.S., Criminal Law §§ 1081 and 1090 (1961).

[7] The prosecutor is entitled to argue to the jury the law and the facts in evidence and all reasonable inferences to be drawn therefrom. *State v. Conner,* 244 N.C. 109, 92 S.E. 2d 668 (1956); *State v. Willard,* 241 N.C. 259, 84 S.E. 2d 899 (1954); *State v. Campo,* 233 N.C. 79, 62 S.E. 2d 500 (1950). On the other hand, he may not place before the jury incompetent, irrelevant and prejudicial matters, and may not "travel outside the record" by injecting into his argument facts of his own knowledge or other facts not included in the evidence. *State v. Monk, supra; State v. Crisp,* 244 N.C. 407, 94 S.E. 2d 402, 67 A.L.R. 2d 236 (1956); *State v. Phillips,* 240 N.C. 516, 82 S.E. 2d 762 (1954); *State v. Dockery,* 238 N.C. 222, 77 S.E. 2d 664 (1953); *State v. Buchanan,* 216 N.C. 709, 6 S.E. 2d 521 (1940).

The fact that the sympathy or prejudice of the jury may be aroused by the argument of counsel does not render the argument improper when it is legitimate and based on competent evidence. Only comments calculated to inflame unduly the passions and prejudices of jurors are improper.

"Ordinarily, legitimate arguments based on competent evidence in the case are not rendered improper by the fact that they incidentally stir the sympathies and prejudices of the jury, and, a fortiori, do not constitute error where they are relatively of little importance, and have no ten-

dency to create sympathy or prejudice greater than the facts in evidence create, or where they are within the permissible bounds of fair comment and are not in fact inflammatory to the extent of constituting misconduct by the prosecuting attorney. On the other hand, comments calculated unduly to create, arouse or inflame their sympathies, prejudices, or passions to the detriment of the accused are improper.

\*    \*    \*    \*

. On the other hand, it has been held not to be an improper appeal to the sympathies and prejudices of the jurors to denounce crime in strong terms, or to characterize the crime charged or point out its gravity, heinousness, and consequences; but comments to the effect that the crime was of such a nature as might well have induced relatives of the injured person or citizens generally to take the law into their own hands are usually held improper." 23A C.J.S., Criminal Law § 1105 (1961).

Applying these principles to this case, the district attorney's argument is within permissible bounds of fair debate, except the portion to which Exception No. 67 is addressed. That portion was improper and the trial judge stopped it before any prejudice, beyond that created by the facts themselves, was done. *See State v. Barefoot,* 241 N.C. 650, 86 S.E. 2d 424 (1955). Assignment number ten is overruled.

Assignments one, seven and nine are not discussed in defendant's brief and are therefore deemed abandoned. Rule 28, Rules of Practice in the Supreme Court, 254 N.C. 783, 810 (1961).

[8] The witness Alden Ernest Pease testified that Ruth Kendall's character and reputation in the community in which she lived was outstanding. On cross-examination he testified that he was a special investigator with an intelligence unit involving seven states but, by reason of the confidential nature of his work, could not reveal details concerning the type of work involved or the identity of his employer. Defendant's fourth assignment of error is addressed to the refusal of the court to require the witness to reveal that information. It suffices to say that the nature of Mr. Pease's work had nothing to do with the basis of his testimony concerning Mrs. Kendall's character and reputation in her community. This assignment is overruled without further discussion.

[9] Defendant's twelfth assignment of error argues the unconstitutionality of the death penalty. This point has already been the subject of final judicial determination in this State until and unless further review is required by legislative enactment or by the Supreme Court of the United States. *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19 (1973) *State v. Jarrette,* 284 N.C. 625, 202 S.E. 2d 721 (1974); *State v. Crowder,* 285 N.C. 42, 203 S.E. 2d 38 (1974); *State v. Fowler,* 285 N.C. 90, 203 S.E. 2d 803 (1974).

Examination of the entire record discloses that defendant received a fair trial free from prejudicial error. The verdict and judgments must therefore be upheld.

No error.

Chief Justice SHARP dissents as to the death sentence and votes to remand for imposition of a sentence of life imprisonment for the reasons stated in her dissenting opinion in *State v. Williams,* 286 N.C. 422, 434, 212 S.E. 2d 113, 123 (1975).

Justice COPELAND dissents as to death sentence and votes to remand for imposition of a sentence of life imprisonment for the reasons stated in his dissenting opinion in *State v. Williams,* 286 N.C. 422 at 437, 212 S.E. 2d 113 at 122 (1975).

Justice EXUM dissenting:

In my view there was prejudicial error in the trial in the admission of much of the character evidence and in the prosecutor's closing argument.

· The testimony of several of the character witnesses in response to the district attorney's questions regarding the "basis" for earlier and properly expressed opinions constituted an improper effort by the State to prove, over objection of the defendant, the character of the prosecuting witness by specific acts and personal opinion. The witness Judson was allowed to testify that his opinion of the prosecuting witness' character was based upon "personal observation" and "upon my own seeing what she has done on her courage and her integrity." The witness Godwin testified that the prosecuting witness was in his Sunday School Class and the choir which he directed and that she regularly attended meetings every Wednesday night and

every Sunday and that he could "find nothing wrong with her whatsoever." The witness Ledbetter said his opinion was based on his "own personal observation." The witness Reinburger said that her opinion was based on her own "personal observation of the prosecuting witness' reaction to things." The witness Riggin testified that she had had the prosecuting witness in her home on Christmas and her opinion of her character was based on "just personal observation." The witness Harris testified that "in her opinion the prosecuting witness is a fine Christian girl."

While the State was entitled to prove the character of the prosecuting witness both on the issue of her credibility and on the issue of whether she consented to the sexual intercourse, the only method of proof previously sanctioned by this Court and most other jurisdictions is by showing the general reputation of the witness in the community where she lived. *Michelson v. United States,* 335 U.S. 469, 93 L.Ed. 168, 69 S.Ct. 213 (1948) ; *State v. McEachern,* 283 N.C. 57, 194 S.E. 2d 787 (1973) ; *State v. Steen,* 185 N.C. 768, 117 S.E. 793 (1923). See 1 Stanbury's North Carolina Evidence, Brandis Revision, § 110 at 336-337, and cases cited, where it is stated:

> "There are three methods by which a person's character might conceivably be proved: (1) by the opinion of those who know him, (2) by reputation, and (3) by specific acts. Where a character is directly in issue, it seems that all three of these processes are available. But when character is offered as evidence of a person's conduct on a particular occasion, the first method is not allowed at all, and the third is available only on cross-examination of the person whose character is in question. Therefore the standard method, and usually the only permissible method, of proving character is by *reputation.*"

It is clear that the character of the prosecuting witness was not directly but only collaterally in issue. Character is directly in issue only when it is one of the ultimate facts to be proved or disproved in the case, for example, in actions for defamation where injury to reputation is one of the principal measures of damage or in prosecutions for the seduction of an "innocent and virtuous woman" under General Statute § 14-180. 1 Stansbury's North Carolina Evidence, Brandis Revision, § 102. Where character evidence "is offered on the question of a witness' credibility, or as evidence that a party or third person did or did not do a particular thing" it is only collaterally in issue. *Id.* § 111,

State v. Stegmann

n. 5. A criminal defendant may offer evidence of his good character both on the question of his credibility if he testifies and on the question of his guilt whether or not he testifies, but his proof must be limited to his general reputation in the community. *Michelson v. United States, supra; State v. McKissick,* 271 N.C. 500, 507, 157 S.E. 2d 112, 118 (1967) ; *State v. Sentelle,* 212 N.C. 386, 193 S.E. 405 (1937). The Supreme Court of the United States, reviewing the general law on the subject, stated the rule as follows:

> "The witness may not testify about defendant's specific acts or courses of conduct or his possession of a particular disposition or of benign mental and moral traits; nor can he testify that his own acquaintance, observation, and knowledge of defendant leads to his own independent opinion that defendant possesses a good general or specific character, inconsistent with commission of acts charged. The witness is, however, allowed to summarize what he has heard in the community, although much of it may have been said by persons less qualified to judge than himself. The evidence which the law permits is not as to the personality of defendant but only as to the shadow his daily life has cast in his neighborhood." *Michelson v. United States,* 335 U.S. at 477, 93 L.Ed. at 174, 69 S.Ct. at 219.

This is also the North Carolina rule stated in *State v. Steen,* 185 N.C. at 770, 117 S.E. at 794 as follows:

> "In North Carolina the testimony of a character witness is confined to the general reputation of the person whose character is attacked, or supported, in the community in which he lives. *State v. Parks,* 25 N.C., 296; *State v. Perkins,* 66 N.C., 126; *State v. Gee,* 92 N.C., 756; *State v. Wheeler,* 104 N.C., 893; *State v. Coley,* 114 N.C., 879, and numerous other cases since. Reputation is the general opinion, good or bad, held of a person by those of a community in which he resides. This is eminently a matter of hearsay, based upon what the witness has heard or learned, not as to any particular acts, but as to the general opinion or standing in the community."

This same rule has previously been true with regard to the prosecutrix in a rape case. "The State may only prove her general character—it may not offer proof of particular traits of

State v. Stegmann

character." *State v. Grundler,* 251 N.C. 177, 192, 111 S.E. 2d 1, 12 (1959).

The reason for the rule limiting character evidence to general reputation is grounded not in logic but in policy and expediency. *Michelson v. United States, supra; State v. Adams,* 193 N.C. 581, 137 S.E. 657 (1927). Certainly the opinion of a witness who knows the person whose character is in question and prior specific acts of that person are highly relevant on the question of the person's character. We have said, however, that the rule prohibiting this kind of evidence "is both sound and salutary, for the reason that it obviates a mass of collateral questions which would interminably prolong trials and inevitably result in drawing the minds of the jurors far afield from the merit of the case." *State v. Adams,* 193 N.C. at 582, 137 S.E. at 658.

The holding of the majority, I fear, dangerously ignores the policy for limiting character evidence previously recognized by this and other courts. If the good character of the prosecuting witness in a rape case may be shown by the State through the personal opinion of witnesses who know her and by their revelation of her specific acts then the defendant must be allowed to attack her character by the same kind of testimony. The character of a defendant may likewise be proved. The majority opinion takes us back to what Justice Jackson in *Michelson v. United States, supra,* called "the frontier phase of our law's development, [where] calling friends to vouch for defendant's good character, and its counterpart—calling the rivals and enemies of a witness to impeach him by testifying that his reputation for veracity was so bad that he was unworthy of belief on his oath— were favorite and frequent ways of converting an individual litigation into a community contest and a trial into a spectacle." 335 U.S. at 480, 93 L.Ed. at 176, 69 S.Ct. at 220.

At Stegmann's first trial character evidence was not offered. The jury was unable to agree on a verdict. The improper admission of this evidence was clearly prejudicial to the defendant.

The district attorney's argument to the jury, set out verbatim in the majority opinion, to the effect that because of the rules of evidence the State was unable to present certain evidence to the jury and that these rules were for the protection of the defendant was improper. It permitted the jury to speculate on what might have been offered; it allowed the State to

circumvent the rules of evidence and do indirectly what it could not do directly. The majority justifies the permissibility of the argument on the ground that it was invited by defense counsel and seems to say that it related solely to the question of whether the defendant had previously been arrested for rape. Defense counsel did, indeed, argue that there was no evidence that defendant had been arrested for rape—"just accusation." There was, however, evidence that he had been so arrested from the testimony of the prosecuting witness herself regarding statements made to her by the defendant. The majority recognizes that testimony of officers for the State and of the defendant "tended to show that he had *in fact* been arrested for a similar incident." Defense counsel, moreover, argued justifiably the failure of the State to offer into evidence the black underpants of the prosecuting witness. Whatever the district attorney's intent, the jury may well have understood from his argument that the State, somehow, was precluded by law from offering this evidence.

This kind of argument by the prosecution has been consistently condemned and held to be reversible error in cases from this and other jurisdictions. *State v. Roach,* 248 N.C. 63, 102 S.E. 2d 413 (1958) ("I tell you I could get a number of people, at least one hundred, to come in here and testify to his bad character") ; *Ginsberg v. United States,* 257 F. 2d 950 (5th Cir. 1958) ("I could probably have fifty people in here who would show that [defendant] isn't a good character") ; *Snipes v. United States,* 230 F. 2d 165 (6th Cir. 1956) ("We could have made thirty or forty counts in this thing, if you had wanted to be here a couple of weeks trying this lawsuit") ; *People v. Talle,* 111 Cal. App. 2d 650, 676-677, 245 P. 2d 633, 649 (1952) ("[Argument which] broadly implies the prosecution is possessed of much evidence tending to show guilt that has not been introduced, is erroneous and prejudicial"). It has been so held even where the argument was prompted by statements made by defense counsel and curative instructions were given by the trial court. *State v. Eagle,* 233 N.C. 218, 63 S.E. 2d 170 (1951) ; *Kitchell v. United States,* 354 F. 2d 715 (1st Cir. 1965). *But see Commonwealth v. French,* 357 Mass. 356, 259 N.E. 2d 195 (1970) ("[Y]ou have to use your imagination. There are many things in a court of law that can't be introduced." Held, improper but harmless because of adequate curative instructions.)

In *State v. Eagle, supra,* a drunk driving prosecution, defendant had argued the failure of the State to introduce into

evidence a bottle of whiskey referred to in the testimony of State's witnesses. In his argument to the jury the district attorney explained why the whiskey bottle had not been produced, stated that he had sent for the bottle and had it in a paper sack and was willing for it to be shown to the jury. Defendant objected and moved for an instruction that the jury not consider the argument. The motion was denied but in his instructions to the jury the trial judge told them to disregard that portion of the State's argument. We, nevertheless, because of this argument awarded defendant a new trial.

In *Kitchell v. United States, supra,* the government argued:

"[T]here was a comment made by defense counsel, there is no evidence here that Mr. Kitchell knew of any of the other defendants. I submit to you it is an unfair comment. There are certain rules of evidence, his Honor will instruct you about, what the Government can introduce without prejudice to its case. I submit it is in that light you must consider that comment." 354 F. 2d at 719.

Upon objection the trial judge immediately instructed Government counsel to make no further argument of that nature. But counsel returned to say to the jury, "The issue is not, does he know these other defendants? If that were the issue, we would bring in an entirely different set of witnesses." *Id.* These arguments were held to justify a new trial. The court said:

"Remarks on the availability of unused 'evidence' are clearly impermissible. *Ginsberg v. United States,* 5 Cir., 1958, 257 F. 2d 950; see *United States v. Lefkowitz,* 2 Cir., 1960, 284 F. 2d 310, 314; cf. *Greenberg v. United States,* 1 Cir., 1960, 280 F. 2d 472, 475. Conceivably a single error in this regard might have been cured by the court's sustaining the objection. The Government cannot go on, however, making such remarks and having the court strike them out, and then claim they had no effect." *Id.*

In *State v. Monk,* 286 N.C. 509, 212 S.E. 2d 125 (1975), we held it to be prejudicial error for the State to argue that a person's criminal record cannot be offered in evidence unless the person testifies on the ground, however, that the remark amounted to an impermissible comment upon the failure of the defendant to testify in his behalf.

Stegmann, through counsel, promptly objected to the prosecutor's argument here complained of and moved for a mistrial.

His objection was overruled and motion denied. No curative in-structions were attempted. This constituted error, in my opin-ion, entitling defendant to a new trial.

The evidence in this case is sharply conflicting. The ques-tion of guilt hangs largely on the credibility which the jury accords to the prosecuting witness and to the defendant. I am unable to say that the improper character evidence and the im-proper portions of the State's closing argument constituted error which was harmless beyond a reasonable doubt.

I also dissent from the imposition of the death sentence for the reasons stated in my dissenting opinion in *State v. Williams,* 286 N.C. 422, 212 S.E. 2d 113 (1975).