J. ZEB INGLE v. ROY STONE TRANSFER CORPORATION AND BILLY JACK HARBOUR.

(Filed 25 August, 1967.)

**1. Evidence § 56—**
    Cross-examination of a witness for the purpose of impeachment is not limited to inquiry as to the witness' prior convictions of offenses involving moral turpitude, but the witness may be asked on cross-examination as to any prior convictions of crime.

**2. Automobiles § 118—**
    While the violation of either section of G.S. 20-140 constitutes culpable negligence, the violation must be either intentional or must be accompanied by such recklessness or carelessness as to import a thoughtless disregard of consequences or a heedless indifference to the safety and rights of others, and result in injury or death, but the unintentional violation of a safety statute which is not accompanied by recklessness or probable consequences of a dangerous nature when tested by the rule of reasonable provision, is not culpable negligence.

**3. Automobiles §§ 73, 90—**
    An instruction on the issue of contributory negligence which incorporates the provisions of G.S. 20-140 and charges that if plaintiff was guilty of reckless driving as defined in the statute plaintiff would be guilty of contributory negligence if such violation was a proximate cause of the injury, *held* erroneous, it being required that the court apply the law relating to reckless driving to the particular facts presented by defendant's evidence in regard to plaintiff's contributory negligence. G.S. 1-180.

APPEAL by plaintiff from *Hobgood, J.*, 14 November 1966 Civil Session of ALAMANCE.

Action to recover damages for personal injuries. About 1:00 p.m. on 20 September 1963, a fair, clear day, plaintiff, a route salesman for Melville Dairy, was operating one of its milk delivery trucks in a northerly direction on N. C. Highway No. 87, approximately 10 miles north of Burlington. At that point, No. 87 is a level, 2-lane highway with pavement about 19 feet wide and with 5-foot shoulders. As plaintiff made a left turn into the driveway of Lacy Smith, whose residence is on the west side of the road, the milk truck was struck on its left side by a tractor-trailer owned by the corporate defendant and operated by its employee, defendant Billy Jack Harbour. The tractor-trailer, also traveling north, was attempting to pass the milk truck at the time of the collision. In the collision, plaintiff received multiple injuries and was rendered unconscious. A head injury left him with a permanent speech impairment.

The investigating officer, Trooper James C. Pierce, Jr., gave testimony which tended to show: The driveway into the Smith home is 800 feet north of Rural Paved Road 1578, which intersects No. 87 from the west. Between this intersection and the Smith drive, No. 87 curves slightly. A yellow line in the northbound lane extends from the intersection to a point 213 feet south of the Lacy Smith driveway. Visibility between the rural paved road and the Smith driveway is uninterrupted in both directions. The speed limit for the area is 55 MPH for automobiles and 45 MPH for trucks. Pierce found debris in the northbound lane directly in front of the Smith driveway. It was about in line with the drive axle in the middle set of wheels on the rig of the tractor-trailer, the back end of which

was in the southbound lane and the front end of which was off the highway on the north side of the Smith driveway. The milk truck was on the east shoulder 145 feet northeast of the tractor-trailer. Its left-turn signal was pulled down.

Plaintiff's testimony tended to show: He had entered No. 87 from Rural Paved Road 1578 and had driven northwardly behind a farm truck at 10-15 MPH toward the home of Lacy Smith, where he intended to make a delivery. When he was 150-200 feet from the driveway, he turned on his left-turn signal. Just before turning, he looked for traffic approaching from the rear and saw none. At 5-10 MPH, he then began to turn into the drive at an angle. Because of small bushes and shrubs in the curve on the east side of the highway, he could not see more than 500 feet to the south. After his front wheels were over the center line, he saw the tractor-trailer for the first time. It was 75-150 feet away and traveling at a speed of 55-60 MPH. At no time did he hear a horn. At the time of the impact, his left-turn signal was still on.

Plaintiff's witness, Robert Lee Carter, who was riding in the back of the farm truck and facing south, testified in substance as follows: He saw the accident. The milk truck's signal light began flashing for a left turn 100 feet before it reached the Smith driveway. At the time plaintiff started his turn to the left, defendants' tractor-trailer was still on its right side of the road, 150-200 feet behind the milk truck and traveling between 55-60 MPH. When it was 60-75 feet behind it, the tractor-trailer pulled out to pass the milk truck. Carter heard no horn blow. The driver of the truck transporting Carter also testified that he heard no horn sound; the first thing he heard was "the terrific noise of metal hitting together."

Defendants' evidence tended to show: The length of the tractor-trailer unit which Harbour was driving was 50 feet; the tractor was 9 feet high and the trailer 12 feet, 4 inches high. Harbour first saw the milk truck when it was about 100 feet north of the rural paved road and he was 400-500 feet behind it, traveling between 40-45 MPH. As he approached the milk truck, it was moving at 20-25 MPH. When he was about 125 feet from the truck, he pulled into the left lane and blew his air horn to go around. At no time did he see any signal from the milk truck. When he was about 45 feet from it, and the truck was 5-10 feet from the Smith driveway, it turned "practically straight across from the driveway" in front of him. He applied brakes as hard as he could but hit the milk truck, which rolled to its right, then straightened up and went into the ditch. He immediately went to the truck, where he found plaintiff unconscious.

The case was submitted to the jury upon the issues of negligence, contributory negligence, and damages. The jury answered the first two issues YES, and the court entered judgment dismissing the action. Plaintiff appealed.

*Smith, Leach, Anderson & Dorsett by C. K. Brown, Jr.; H. Clay Hemric for plaintiff appellant.*
*Smith, Moore, Smith, Schell & Hunter by Stephen Millikin for defendant appellees.*

SHARP, J. For the purpose of impeaching plaintiff's witness Carter, counsel for defendant asked him if he had not "been convicted of several criminal charges." Over plaintiff's objection, counsel elicited from Carter that he had been convicted of the following offenses: Speeding 65 MPH in a 55 MPH zone; exceeding a safe speed; drunken driving; operating a motor vehicle while his license was suspended; disregarding a stop sign; public drunkenness; and allowing an unlicensed minor to operate a motor vehicle. Plaintiff's assignments of error 1 and 4 are based upon the admission of this evidence.

Plaintiff argues that convictions for violations of the motor vehicle laws have no direct bearing upon veracity and indicate no moral turpitude. He contends that cross-examination for the purpose of impeaching a witness should be confined to such offenses as false pretense, fraud, cheating, and other crimes indicating a disposition to falsify. He cites the following comment of Seawell, J., made by way of *dicta,* in *State v. King,* 224 N.C. 329, 333, 30 S.E. 2d 230, 232: "It would be a barbarous rule which called in question a man's veracity because of the violation of a petty traffic law of which he may not have any knowledge." The decision in *State v. King* was that record evidence showing the criminal convictions of a State's witness was not competent for the purpose of impeaching him.

In this State, a witness may be impeached by evidence that his general character is bad or it may be corroborated by evidence that it is good. *State v. Troutman,* 249 N.C. 395, 106 S.E. 2d 569; *State v. Ellis,* 243 N.C. 142, 90 S.E. 2d 225; *State v. Nance,* 195 N.C. 47, 141 S.E. 468; *In re McKay,* 183 N.C. 226, 111 S.E. 5; *Lumber Co. v. Atkinson,* 162 N.C. 298, 78 S.E. 212; *State v. Bullard,* 100 N.C. 486, 6 S.E. 191; see *State v. King, supra;* Stansbury, North Carolina Evidence § 107 (2d Ed., 1963). For the purpose of impeachment, the witness himself is subject to cross-examination as to his convictions of crime. *State v. Norkett,* 269 N.C. 679, 153 S.E. 2d 362 (defendant admitted convictions of assault with a deadly weapon, store breaking, and larceny); *State v. Sheffield,* 251 N.C. 309, 111 S.E. 2d 195

(defendant admitted conviction of robbery); *Nichols v. Bradshaw,* 195 N.C. 763, 143 S.E. 469 (witness convicted of "blockading"); *State v. Colson,* 194 N.C. 206, 139 S.E. 230 (witness cross-examined with reference to violations of the prohibition law and failure to support his wife); *Coleman v. R. R.,* 138 N.C. 351, 50 S.E. 690 (The court said, "It was competent, to impeach the plaintiff, to show by him that he had been convicted of forcible trespass.").

In *State v. Sims,* 213 N.C. 590, 197 S.E. 176, defendant, indicted for murder, testified as a witness in his own behalf. On cross-examination, the State drew from him admissions that he had been convicted of "beating a ride on a freight train" and that he had six times been "up for gambling" and sentenced therefor. With reference to this evidence, the Court said:

> "It is not the practice in this jurisdiction to limit the cross-examination for the purpose of impeachment to felonies, or to crimes involving moral turpitude. In fact, cross-examination for the purpose of impeachment is not limited to conviction of crimes. Any act of the witness which tends to impeach his character may be inquired about or proven by cross-examination." *Id.* at 593, 197 S.E. at 178.

These cases, *inter alia,* clearly justify the statement in Stansbury, North Carolina Evidence § 112 (2d Ed., 1963) that, for the purpose of impeaching a witness, "apparently any sort of criminal offense may be inquired about. . . ." In discussing what crimes are relevant to indicate bad character as to credibility, Wigmore says: "If in a given jurisdiction general bad character is allowable for impeachment, then *any offense* will serve to indicate such bad character." Wigmore, Evidence § 980, p. 538 (3d Ed., 1940).

Plaintiff would have us change this rule, but, as pointed out by McCormick in his discussion of conviction of crime as a ground of impeachment, much confusion has resulted in those jurisdictions which, by statute, have limited the impeaching effect of convictions to "infamous crimes" and to those involving "moral turpitude." He says:

> "The California Code and codes modeled upon it, adopt the limitation to 'felonies,' which is at least simple to apply. Similarly easy of administration is the English description 'any felony or misdemeanor.' This last seems to be the construction which some of the courts place upon the statutes worded in terms of 'crime' or 'any crime.' But most courts, oversensitive perhaps to the feelings of witnesses, have been unwilling to accept such simple mechanical tests, and have read into such general statutes the requirement that as to misdemeanors at

least, the offense must be one involving 'moral turpitude.' Thus does the serpent of uncertainty crawl into the Eden of trial administration. Still more uncertain is the situation in the states which leave to the trial judge's discretion whether the particular conviction substantially affects the credibility of the witness. It seems questionable whether the creation of a detailed catalog of crimes involving 'moral turpitude' and its application at the trial and on appeal is not a waste of judicial energy in view of the size of the problem. Moreover, it seems that shifting the burden to the judge's discretion is inexpedient, since only in a minority of cases will the judge have adequate information upon which to exercise such discretion. A clear certain rule like the English one is preferable, despite its somewhat arbitrary cast. Perhaps better still is the proposal of the Uniform Rules to limit impeachment to conviction of crimes 'involving dishonesty or false statement,' a fairly definite, but not arbitrary criterion." McCormick, Evidence § 43, pp. 90-91 (1954).

In 98 C.J.S., Witnesses § 507, p. 407-8 (1957) (cited by plaintiff as 70 C.J. § 1052 at p. 851) as bearing upon a witness' credibility, we find this statement: "(I)t is usually held improper to show the conviction of a mere misdemeanor or minor offense which does not involve moral turpitude, or an offense which is not regarded as being infamous or *crimen falsi* in its nature." The footnotes to the above quotation disclose that in other jurisdictions the following convictions have been held inadmissible for the purpose of impeachment; adultery, burglary in the second degree with sentence to the county jail for six months, disorderly conduct, vagrancy, first conviction for drunken driving of automobile, petit larceny, violation of liquor laws; assault with a deadly weapon where imprisonment was in the county jail; carrying concealed weapons; drunkenness and possession of intoxicating liquor; obtaining money under false pretenses, assault, drunkenness and disorderly conduct, fighting and shooting craps, gaming, operating a motor vehicle while intoxicated, violations of Dyer Act relating to transportation of stolen property, making false tax schedule, prostitution, throwing stones at a railroad train, deserting wife and children, operation of still. These examples, from many states, illustrate the problem posed and point up the diversity of opinion as to what crimes cast doubt upon an individual's credibility and adversely affect his general character. Certainly, a conviction for violating a city ordinance against spitting on the sidewalk would not cast doubt on a person's credibility; neither, ordinarily, will a conviction of speeding 45 MPH in a 35 MPH zone — certainly not if he pled guilty! We are not prepared

to say, however, that a conviction of any one of the majority of the crimes listed in the above C.J.S. footnote would not thereafter cast some doubt upon the credibility of the person convicted, nor do we think that a person who has been guilty of drunken driving, or who consistently violates motor vehicle laws designed to protect life and property on the highway, can claim an unblemished general character.

In *McMullen v. Cannon*, 129 Ind. App. 11, 150 N.E. 2d 765, the plaintiff, who testified in his own behalf, was asked on cross-examination whether he had been convicted of operating a motor vehicle under the influence of intoxicating liquor. The objection of his counsel was sustained upon the ground that the conviction had no bearing on the witness' credibility. In ordering a new trial because of the exclusion of the evidence, the Appellate Court of Indiana said:

> "In this state the rule is deeply entrenched in the case law that a witness, including a party to the action who takes the stand as a witness in his own behalf, may be required on cross-examination, as affecting his credibility, to answer as to previous convictions, whether such convictions were of felonies or misdemeanors.
>
> \* \* \*
>
> "A reference to the latest annotation on the question, found in 20 A.L.R. 2d 1217, section 3 on page 1218, indicates that the courts which have passed on the question are, as usual, divided. It is interesting to note, however, that in New York, under a statute providing that a conviction for traffic infraction may not be introduced to impeach the credibility of a witness, such statute was construed so as not to include a conviction for drunken driving and the cross-examination of the defendant driver as to whether he had been convicted of driving while intoxicated was held permissible. See *Geiger v. Weiss*, 1935, 245 App. Div. 817, 281 N.Y.S. 154."

*Accord, Black v. State*, 215 Ark. 701, 222 S.W. 2d 816; *State v. McKissic*, 358 S.W. 2d 1 (Mo. Sup. Ct. 1962); *Monaghan v. Keith Oil Corporation*, 281 Mass. 129, 183 N.E. 252.

We also adhere to our rule, which has the virtue of certainty. Responsible counsel will not abuse it. Jurors are intelligent people; most are also motorists, and, should abuse occur, they can be counted on to evaluate the situation properly. Furthermore, the judge is in charge of the trial, and he has plenary power to protect a witness from harassment and to keep cross-examination within the bounds of reason.

Plaintiff's assignments of error 6, 7, 10, and 11 relate to the court's charge upon reckless driving as it relates to the issue of contributory negligence. Plaintiff and defendant each alleged that the other was guilty of reckless driving. In charging upon the first issue, the judge read G.S. 20-140 to the jury and then said:

> "The Court instructs you that, under this section, a person is guilty of reckless driving if (1) he drives an automobile or motor vehicle on a public highway in this State carelessly and heedlessly in a willful or wanton disregard of the rights and safety of others, or (2) if he drives an automobile on a public highway in this State or a motor vehicle on a public highway of this State without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or property."

Before giving the preceding instruction, the judge told the jury to bear the definition of reckless driving in mind so that he would not have to repeat it in charging upon the issue of contributory negligence. On the second issue, he charged as follows:

> "Now, on this issue, the defendant says that the plaintiff was guilty of specific acts of contributory negligence. One, that the plaintiff was guilty of reckless driving, and the Court has explained that term to you. If you find the plaintiff, on said date and occasion and in the manner he drove the milk truck, was guilty of reckless driving in either of the two particulars set forth in the explanation by the Court, then that would be negligence on his part, and if you find that was a proximate cause of the injury he suffered, then you would answer the second issue YES."

Plaintiff contends (1) that there was no evidence tending to show that he was guilty of reckless driving and (2) that, if there was, the judge's instruction failed to comply with G.S. 1-180 in that he failed utterly to tell the jury what facts they must find in order to adjudge plaintiff guilty of culpable negligence.

A violation of G.S. 20-140 is negligence *per se* and gives rise to both civil and criminal liability. *Dunlap v. Lee*, 257 N.C. 447, 126 S.E. 2d 62; *Carswell v. Lackey*, 253 N.C. 387, 117 S.E. 2d 51; but allegations as to reckless driving in the words of G.S. 20-140 without specifying wherein the party was reckless amount to no more than an allegation that the party charged was negligent. They are but conclusions of law which are not admitted by demurrer. *Troxler v. Motor Lines*, 240 N.C. 420, 82 S.E. 2d 342. They do not justify a charge on reckless driving. *Dunlap v. Lee, supra; Fleming v. Drye,*

253 N.C. 545, 117 S.E. 2d 416. Reckless driving is made up of continuing acts, or a series of acts, which, in themselves, constitute negligence. To plead reckless driving effectively, the pleader must particularize with reference to the the specific rules of the road which the motorist was violating and his manner of doing so. Usually, in doing this he will merely repeat previous or subsequent allegations with reference to negligence or contributory negligence, and nothing but excess verbiage has been added to the case. Civilly, a person is equally liable for injuries resulting from his ordinary negligence and from culpable negligence in the form of reckless driving where no intentional injury is. involved. Similarly, when the judge has correctly instructed the jury upon the law applicable to the various acts of negligence upon which the pleadings and evidence require a charge, there is no need to reassemble. the parts and present them to the jury in a packaged proposition labeled reckless driving, for the whole is equal to the sum of its parts. If, however, he undertakes to do so, G.S. 1-180 requires him to tell the jury what facts, which they might find from the evidence, would constitute reckless driving. It is not sufficient for the judge to read the statute and leave it to the jury — as he did here — to apply the law to the facts and to decide for themselves what plaintiff did, if anything, which constituted reckless driving. *Sugg v. Baker*, 258 N.C. 333, 128 S.E. 2d 595; *Dunlap v. Lee, supra.* Such an instruction abdicates the judicial function and permits the jury "to roam at large in an unfenced field."

The language in each section of the reckless driving statute, G.S. 20-140, defines culpable negligence. *Dunlap v. Lee, supra.* "Culpable negligence is such recklessness or carelessness, proximately resulting in injury or death, as imports a thoughtless disregard of consequences or a heedless indifference to the safety and rights of others." *State v. Cope*, 204 N.C. 28, 30, 167 S.E. 456, 458. The intentional, wilful or wanton violation of a safety statute or ordinance which proximately results in injury is culpable negligence; an unintentional violation, unaccompanied by recklessness or probable consequences of a dangerous nature, when tested by the rule of reasonable prevision, is not. *State v.· Cope, supra.*

Here, the evidence discloses that plaintiff was not traveling at a dangerous speed. "Mere failure to keep a reasonable lookout does not constitute reckless driving. To this must be added dangerous speed or perilous operation." *State v. Dupree*, 264 N.C. 463, 142 S.E. 2d 5. Neither the intentional nor the unintentional violation of a traffic law *without more* constitutes reckless driving. *State v. Gurley*, 253 N.C. 55, 116 S.E. 2d 143; *State v. Sutton*, 244 N.C. 679, 94 S.E. 2d 797. To suggest that plaintiff intentionally violated G.S. 20-154(a) when he turned across the road to enter the Smith driveway is to

attribute to him suicidal motives. Taking the evidence in the light most favorable to defendants, however, and applying the law relating to reckless driving to it, the judge could have correctly charged the jury as follows: If you should find that defendant Harbour gave an audible warning with his horn of his intention to pass the milk truck; that he gave it in adequate time for plaintiff to have avoided injury which would probably result from a left turn; that plaintiff heard the horn; that notwithstanding, he heedlessly turned to his left across the highway without first looking to see that the turn could be made in safety and without making any effort to ascertain the whereabouts of the vehicle from whence came the signal he had heard — such conduct would constitute reckless driving and negligence on the part of plaintiff. If you should further find that such negligence on the part of plaintiff contributed to his injury as a proximate cause or one of the proximate causes thereof, you would answer the second issue Yes.

The issue of contributory negligence was properly submitted to the jury, but, for the failure to charge correctly on reckless driving, there must be a

New trial.