STATE OF NORTH CAROLINA v. ALLEN CURRIE

No. 24

(Filed 11 November 1977)

**1. Criminal Law § 67— voice identification—exclusion of cross-examination**

In this prosecution for rape and armed robbery in which the victim testified that the voice of her assailant "was not the voice of an average colored man" and that she recognized defendant's voice as the voice of her assailant, the trial court did not abuse its discretion in excluding the victim's testimony on cross-examination that her assailant didn't use the average slang of a Negro, his words were clear, and he did not talk like a Negro she had ever heard before; furthermore, the exclusion of such testimony was not prejudicial since admission of the testimony could not have influenced the verdict favorably for defendant or produced a different result.

**2. Criminal Law § 86.2— impeachment—prior convictions**

For impeachment purposes a witness, including the defendant in a criminal case, may be cross-examined with respect to prior convictions of crime and may be asked disparaging questions concerning collateral matters relating to his criminal and degrading conduct.

**3. Criminal Law § 86.3— prior convictions—conclusiveness of witness's answer— sifting the witness**

While the answers of a witness with respect to prior convictions are conclusive in the sense that the record of his convictions may not be introduced to contradict him, the cross-examiner, by appropriate questions, may continue to inquire about specific convictions already denied as well as other prior unrelated criminal convictions so as to "sift the witness."

**4. Criminal Law § 86.3— prior convictions—answer of witness—further questions by prosecutor**

Where defendant, in response to the prosecutor's question on cross-examination as to whether he had agreed to make restitution to five different businesses that he had broken into, stated that he "thought it was just one place," the prosecutor was properly allowed to "sift the witness" by asking defendant whether he had agreed as part of his probation to pay restitution to four named businesses.

**5. Criminal Law § 85.2— defendant's bad character—specific acts of misconduct**

Testimony by defendant's father on cross-examination that he had stated in a prior trial of defendant for other crimes that he had tried to raise his boys right and couldn't help what happened to his son did not constitute proof of defendant's bad character by evidence of specific acts of misconduct on defendant's part.

**6. Criminal Law § 99.9— question by trial judge—no expression of opinion**

The trial judge's question to a rape victim as to how long she had been working as a telephone operator served only to clarify and promote a proper

understanding of her testimony and did not amount to an expression of opinion by the judge.

**7. Criminal Law § 99.3— judge's statements that evidence not relevant—no expression of opinion**

    In this prosecution for rape and armed robbery, the trial judge's repeated statements that he could not see the relevance of a softball trophy won by defendant's team on the night of the crimes did not constitute an expression of opinion since it was the duty of the trial judge to expedite the trial and to question the irrelevancy or redundancy of evidence, and the judge's statements merely sought a clarifying response, after which counsel was permitted to continue when any relevance was suggested.

DEFENDANT appeals from judgments of *Smith, J.*, 3 January 1977 Criminal Session, ALAMANCE Superior Court.

Defendant was charged in separate bills of indictment, proper in form, with (1) first degree rape and (2) armed robbery of Elizabeth B. Alexander on 29 August 1976. The two cases were consolidated for trial.

The State's evidence tends to show that Elizabeth B. Alexander, fifty-four years of age, had been employed as a switchboard operator at Memorial Hospital of Alamance County for approximately seventeen years. On Sunday, 29 August 1976, she was working the 3 p.m. to 11 p.m. shift. She checked out about 11:05 p.m. and, with keys in hand, walked to her car which was backed into the first space in an employee's parking lot located next to the hospital. A hedge and quite a few trees were around the area. The overhead parking lights were burning, but two had been disconnected to conserve electricity. She was about to insert the key into the lock when she heard a rustling sound. As she swung around a man grabbed her around the neck and said, "I've got a knife to your throat. . . . Don't you scream and don't you holler. . . . Get in the car." She pleaded with him to let her go but he persisted and kept ordering her into the car. She couldn't see his face but could tell he was tall and could tell he was black. When he came at her she saw his clothes. He was wearing a floppy bluish-white hat, cut-off jeans, white athletic socks with a colored band at the top, tennis shoes and either a shirt or other type of cloth around his neck.

Mrs. Alexander's assailant failed to force her into the car and dragged her into a nearby pine thicket at the rear of the hospital grounds, all the while holding the knife to her throat and

threatening to kill her if she ran or screamed. Then, standing behind her, he demanded money and ordered her to empty her wallet and hand him the contents. She gave him what money she had — about four dollars — a credit card, her house keys, post office box key and a book of stamps. Thinking he would release her if she gave him all of her valuables, Mrs. Alexander then gave him her wedding band and her watch, each containing rows of diamonds. The two articles had been appraised at nearly $5,000. She then begged her assailant to release her, explaining the condition of her health and that of her diabetic husband. Ignoring her pleas, he forced her to undress and raped her. She was then ordered to cover her eyes with her hands. He said he was going to walk away slowly, but "if you take your hands off your eyes or look in any direction that I am leaving in, I'll come back and I'll cut your goddamn throat from ear to ear." She heard him move away and lay there on the ground for some time. Finally, she got up, returned to the hospital and was immediately taken to the emergency room. She had sustained numerous cuts and bruises, had neck and jaw injuries from the assault, and tests showed the presence of male sperm in her vagina.

A short while later, Mary Ann Enoch, a twenty-year-old black girl, was standing with a group of friends in a neighborhood not far from the hospital. It was about 11:30 p.m. when she saw Allen Currie, the defendant, coming from the wooded area up the street toward the hospital. He was wearing cut-off shorts, sport socks, red at the top and "white the rest of the way," and a pair of white tennis shoes. "He didn't have any shirt on." In Mary Ann Enoch's words: "He called me out and we talked and he showed me a ring and a watch. The watch was covered with diamonds. He asked me did I want to buy it for $10.00 apiece. I was going to buy it, but I didn't have the money. He put the watch that was studded with diamonds and the rings that had diamonds all over it back in his pocket." Miss Enoch testified that State's Exhibit 1 looked like the watch she saw that night in Allen Currie's possession. She further stated under oath that she had been getting threatening telephone calls all week "about coming down here to testify. I got two last night . . . and I came here of my own free will."

Officer Dupree of the Burlington Police Department testified he was on his way to work shortly after 11 p.m. on the night of 29

August 1976 and saw defendant two blocks from the hospital going in that direction. The officer noticed that defendant was tall, wore cut-off pants and athletic socks and had a floppy hat on his head.

On 9 September 1976 Officer Elgin, armed with a search warrant, went to the home of Allen Currie to search for clothing fitting the description given by Mrs. Alexander. The officer found a pair of cut-off short blue pants, several pairs of athletic socks with red bands around the top, and a floppy brimmed blue hat. These items were seized pursuant to the search warrant and offered into evidence.

Defendant, testifying in his own behalf, stated that he lived at 2509 Aaron Street in Glen Raven with his father, mother, two sisters and four brothers. He is twenty-one years of age and 6 feet 5 inches tall.

Defendant further testified that on 29 August 1976 he was a member of the armed forces and was home on leave between enlistments. On that date he was playing in a softball tournament in the southern part of Alamance County. He left his home and rode with Monroe Graves, the manager of the team, to the site of the tournament. His team was presented a trophy for winning second place, and he rode back to his home in Glen Raven with Mr. Graves. On the way they made several stops to show the trophy to various friends of the players. He arrived home at 10:25 p.m., took a bath and changed clothes, putting on long Army khaki pants, a white T-shirt and black tennis shoes with black socks, not athletic socks. He then had something to eat and left the house about 11 p.m. to join a group of people in front of the home of Annette Wade on Pennsylvania Avenue, a short distance from his own home. He saw Mary Ann Enoch there; she smoked some marijuana, drank some wine and left. He denied that he attempted to sell her a watch and ring.

The Reverend Phillip June Woods testified that he walked the route from defendant's home to Memorial Hospital and it took him thirty-four minutes.

Defendant offered other witnesses in corroboration of his alibi testimony.

State v. Currie

Defendant was convicted on both charges and sentenced to life imprisonment for first degree rape, with credit for time spent in jail pending trial, and forty years for armed robbery, to run consecutively. He appealed the life sentence to the Supreme Court and the robbery sentence to the Court of Appeals. We allowed motion to bypass the Court of Appeals in the robbery case to the end that both matters be initially reviewed by the Supreme Court.

*Rufus L. Edmisten, Attorney General; Elizabeth C. Bunting, Assistant Attorney General, for the State of North Carolina.*

*Harold T. Dodge, attorney for defendant appellant.*

HUSKINS, Justice.

[1] Mrs. Alexander heard defendant's voice for the first time during the assault upon her. On direct examination she stated that the voice of her assailant "was not the voice of an average colored man." When defendant testified during the trial she immediately recognized his voice as that of her assailant. Then, when the defense rested, the trial judge permitted the State to reopen its case and permitted Mrs. Alexander to testify, over objection, that she recognized defendant's voice as the voice of the man who raped and robbed her. Defense counsel then undertook to cross-examine with respect to her additional testimony as compared with her previous statement that the voice of her assailant was not that of an average colored man. The following exchange occurred:

"DEFENSE COUNSEL: Well, now you said on direct examination, as I recall, that this voice you heard was not the voice of an average colored man, is that what you said?

COURT: Answer the question Mrs. Alexander.

A. Yes. Yes, sir.

Q. Are you now saying that this voice of the defendant is not the voice of an average colored man?

PROSECUTOR: Well, object. Now we're getting argumentative.

COURT: Sustained.

EXCEPTION NO. 29"

Had Mrs. Alexander been permitted to answer in the presence of the jury, she would have replied: "He didn't use the average slang of a Negro, the average talk of the average Negro off the street. His words were clear, but he did not talk like a Negro that I ever heard talk before. This boy is more educated." Exclusion of the victim's answer constitutes defendant's first assignment of error.

There is no merit in this assignment. The scope of cross-examination rests largely in the discretion of the trial judge because he is present, hears the testimony, observes the demeanor of the witnesses, knows the background of the case, and is in a favored position to determine the proper limits of cross-examination. For these reasons his rulings thereon will not be disturbed absent abuse of discretion amounting to prejudicial error. *State v. Carver*, 286 N.C. 179, 209 S.E. 2d 785 (1974); *State v. McPherson*, 276 N.C. 482, 172 S.E. 2d 50 (1970); *State v. Ross*, 275 N.C. 550, 169 S.E. 2d 875 (1969), *cert. denied* 397 U.S. 1050 (1970); *State v. Edwards*, 228 N.C. 153, 44 S.E. 2d 725 (1947). Admission of the excluded answer could not have influenced the verdict favorably for defendant or produced a different result. Hence in no view of the matter was the court's ruling prejudicial. Defendant's first assignment is overruled.

[4] Defendant next contends the trial court erred in allowing the State, over objection, to cross-examine him concerning his probationary judgment.

Defendant testified in his own behalf and, as part of his direct examination, stated that in 1972 (sic) he was convicted of breaking and entering, put on probation, ordered to pay back $800 and in fact paid it back. On cross-examination he stated that on 18 January 1973 he pled guilty to breaking and entering Oscar's Snack Bar with intent to commit larceny and stealing $120. He denied breaking and entering Alamance Beauty College, whereupon the prosecutor asked him if he did not agree to make restitution to five different businesses that he had broken into. Defendant said he thought it was just one place. The prosecutor, over objection, then asked: "Did you agree to pay back as part of your probation restitution in the amount of $608 to Oscar's Snack Bar, Bill's Lounge, the Owl Tavern, the Ernest Jackson Poolroom? You remember that, don't you, Mr. Currie?" Over objection,

defendant replied that he remembered those charges. We perceive no error in the admission of this evidence.

[2, 3] For impeachment purposes, a witness, including the defendant in a criminal case, may be cross-examined with respect to prior convictions of crime and may be asked disparaging questions concerning collateral matters relating to his criminal and degrading conduct. *State v. Williams*, 279 N.C. 663, 185 S.E. 2d 174 (1971); *State v. Goodson*, 273 N.C. 128, 159 S.E. 2d 310 (1968); *Ingle v. Transfer Corp.*, 271 N.C. 276, 156 S.E. 2d 265 (1967). With respect to such collateral matters, the answers of the witness are conclusive in the sense that the record of his convictions cannot be introduced to contradict him. *State v. Brown*, 266 N.C. 55, 145 S.E. 2d 297 (1965); *State v. King*, 224 N.C. 329, 30 S.E. 2d 230 (1944); 1 Stansbury's North Carolina Evidence § 112 (Brandis rev. 1973). By appropriate questions, however, the cross-examiner may continue to inquire about specific convictions already denied as well as other prior unrelated criminal convictions so as to "sift the witness." *State v. Gaiten*, 277 N.C. 236, 176 S.E. 2d 778 (1970); *State v. Robinson*, 272 N.C. 271, 158 S.E. 2d 23 (1967).

[4] When the foregoing rules are applied to the challenged cross-examination here, it is readily apparent that no error was committed. Defendant did not deny breaking and entering Oscar's Snack Bar, Bill's Lounge, the Owl Tavern or the Ernest Jackson Poolroom. He merely stated that he "thought it was just one place." The State was not bound by that answer. The cross-examiner was entitled to press or sift the witness in search of the truth. *State v. Fountain*, 282 N.C. 58, 191 S.E. 2d 674 (1972). "The scope of cross-examination rests largely in the trial judge's discretion and his rulings thereon will not be disturbed unless it is shown that the verdict is improperly influenced thereby." *State v. Waddell*, 289 N.C. 19, 220 S.E. 2d 293 (1975); *State v. Carver*, *supra*. No such showing has been made in this case. Defendant's second assignment of error is overruled.

[5] On cross-examination of defendant's father the prosecutor was permitted to inquire whether the father was in court with defendant in 1973 when defendant was placed on probation for various charges of breaking and entering. The prosecutor was further permitted, over objection, to ask the witness if he did not state to the court on that occasion that he had tried to raise his boys right and couldn't help what had happened. The witness

replied: "I said exactly. That is true." Defendant contends the State was thus permitted to show defendant's bad character by implication, *i.e.*, "by proof of specific acts of misconduct of defendant." Counsel argues that although defendant testified he did not otherwise put his character in issue and it was error to permit the challenged cross-examination of his father "as to particular acts of misconduct on the part of the defendant," citing *State v. Green*, 238 N.C. 257, 77 S.E. 2d 614 (1953).

We perceive no error prejudicial to defendant in the challenged testimony. The father's statement at the 1973 trial that he had tried to raise his boys right and couldn't help what had happened to his son does not, as defendant contends, show by implication or otherwise specific acts of misconduct *on defendant's part*. Our decision in *State v. Green*, supra, relied on by defendant, is not in point. Defendant's third assignment of error is overruled.

The following question by the court was put to the witness during the course of the trial: "Mrs. Alexander, how long have you been working as a telephone operator?" She answered: "Going into seventeen years, sir." Defendant took exception thereto and also to certain isolated comments by the judge. At one point when defendant was eliciting testimony concerning the trophy won in the softball tournament by the team on which defendant played, the court said: "I fail to see any relevance to this." Defense counsel explained that he wanted to show "what they did when they came home about this trophy." The court replied: "Well, let's get on to it." Later while examining Mr. Graves, the man in charge of the softball team, counsel requested that he go home and bring the trophy to court. The judge said: "I don't really see what much difference that trophy has to do with this case. . . . What is the purpose of this testimony." Defense counsel replied: "It's alibi, your Honor, to show where he was." The foregoing questions and comments by the court constitutes defendant's fourth and final assignment of error. Defendant contends they amount to an expression of opinion in violation of G.S. 1-180.

There is no merit in this assignment. "It has been the immemorial custom for the trial judge to examine witnesses who are tendered by either side whenever he sees fit to do so. . . ." *State v. Horne*, 171 N.C. 787, 88 S.E. 433 (1916). Of course, such ex-

aminations should be conducted in a manner which avoids prejudice to either party. If by their tenor, their frequency, or by the persistence of the trial judge they tend to convey the impression of judicial leaning, they violate the purpose and intent of G.S. 1-180 and constitute prejudicial error. *State v. Lea,* 259 N.C. 398, 130 S.E. 2d 688 (1963); *State v. Peters,* 253 N.C. 331, 116 S.E. 2d 787 (1960); *Andrews v. Andrews,* 243 N.C. 779, 92 S.E. 2d 180 (1956); *State v. McRae,* 240 N.C. 334, 82 S.E. 2d 67 (1954). Even so, judges are not mere moderators. They preside over the courts as essential and active agencies in the due and orderly administration of justice. "It is entirely proper, and often necessary, that the trial judge ask questions to clarify and promote a proper understanding of the testimony of the witnesses." *State v. Riddick,* 291 N.C. 399, 230 S.E. 2d 506 (1976); *State v. Colson,* 274 N.C. 295, 163 S.E. 2d 376 (1968).

[6]    The question put to Mrs. Alexander served only to clarify and promote a proper understanding of her testimony and did not amount to an expression of opinion by the judge. *State v. Grundler,* 251 N.C. 177, 111 S.E. 2d 1 (1959). Weight and credibility of the testimony remained a matter for the jury.

[7]    With respect to the trophy, the record discloses that defendant was allowed to offer it in evidence with additional testimony concerning its display to various friends at various times. The judge's repeated statement that he could not see the relevance of the trophy merely sought a clarifying response and, when any relevance was suggested, counsel was permitted to continue. It was the duty of the judge to expedite the trial and to question the irrelevancy or redundancy of evidence. In doing so he expressed no opinion in violation of G.S. 1-180. *See State v. Perry,* 231 N.C. 467, 57 S.E. 2d 774 (1950). This assignment is overruled.

There is substantial evidence of all material elements of first degree rape and armed robbery as charged in the bills of indictment. Defendant having failed to show prejudicial error, the verdicts and judgments must be upheld.

No error.