**Sandy Douglas ROSS, Jr., Petitioner,**

**v.**

**Donald STAHL, Sheriff of Mecklenburg County, North Carolina; Rufus Edmisten, Attorney General of North Carolina, Respondents.**

No. C–C–78–280.

United States District Court,
W. D. North Carolina,
Charlotte Division.

Sept. 17, 1980.

Paul L. Whitfield and Rodney Seaford, Charlotte, N. C., for petitioner.

Richard N. League, Asst. Atty. Gen., North Carolina Dept. of Justice, Raleigh, N. C., for respondents.

### ORDER

McMILLAN, District Judge.

On April 6, 1979, a nine–page order was entered which set out the background facts

of this case and scheduled an evidentiary hearing on petitioner's claim that he was deprived of due process of law by a lengthy and prejudicial cross–examination, for "impeachment," by the prosecutor. The evidentiary hearing was later conducted; both the prosecutor and the defense counsel testified. After a review of the entire record, including that testimony, and the cross–examination to which the objections are lodged, the court is of the opinion that petitioner was unconstitutionally denied a fair trial by the allowance of the challenged cross–examination, and that he is entitled to a new trial.

A brief review of those background facts is in order.

Petitioner Sandy Douglas Ross, Jr. owned a four–bedroom house in Charlotte. He rented rooms in the house to others. He was out of town a great deal in 1974 and early 1975 in connection with his duties as engineer and vice president of Carolina Fire Equipment Company. When he was away, his tenants frequently used his bedroom.

On January 3, 1975, Charlotte police, with a warrant, searched Ross's house and reported finding various controlled substances. Ross was prosecuted for unlawful possession of those substances. The search was ruled illegal and the North Carolina district court judge who heard the case ordered the seized evidence suppressed, and dismissed the charges against Ross.

Six months later, in June of 1975, Ross was arrested and charged with the (unrelated) offenses, on February 26, 1975, and February 27, 1975, of possession with intent to sell, and of actual sale, of a quantity of methylenedioxy amphetamine (MDA). He was tried and convicted in Mecklenburg County Superior Court in August of 1977, and his conviction was affirmed by the North Carolina Court of Appeals and by the North Carolina Supreme Court, *State v. Ross*, 295 N.C. 488, 246 S.E.2d 780 (1978). Justice Exum, of the Supreme Court, filed a vigorous dissent in which Chief Justice Sharp and Justice Lake concurred. State remedies have been exhausted.

The only material witness against Ross was an undercover narcotics agent named R. T. Guerette. Guerette had never seen Ross before he saw him (if he did) on February 26, 1975. Guerette testified that he purchased MDA from Ross at Ross's office on February 26, 1975, about 8:00 P.M., and again at Ross's home on February 27, 1975. Jeff Copeland (also known as "Devil"), *according to Guerette*, was present at both the February 26 and the February 27 meeting. Guerette testified that Ross drove a late model, dark colored fastback automobile to the February 26 meeting at the office of Carolina Fire Equipment Company and that the same car was parked at Ross's house at the time of the February 27 meeting.

Ross testified in sharp conflict with the prosecution's evidence, denying that he was in Charlotte or had committed the offenses. He had corroborating witnesses. According to Ross, Jeff Copeland had at one time lived in Ross's house. Copeland at one time sought to borrow money; Ross had refused the loan, and thereafter upon learning that Copeland was dealing in drugs, Ross had evicted Copeland from the premises. Ross did not own a "fastback" automobile, but such an automobile was owned by a girlfriend of one of Ross's tenants. Two witnesses testified that of the three men living in petitioner's house in February 1975, two were of stature similar to Ross and one, Darrell Sides, was similar to Ross in build, hair color, hair length and moustache.

Ross himself testified that he had never seen Guerette before he saw him in court during the trial of the case. Ross testified that on February 26 and 27 when the alleged sales took place he was in Wilmington and Southport (approximately two hundred miles from Charlotte), on business for the Carolina Fire Equipment Company. Ross was corroborated in his alibi testimony by Rufus Scott, his uncle, a manufacturer's representative, who testified that he stayed in Ross's house in Charlotte from February 25 to February 27, and that Ross had left his house keys with Scott and was out of town February 25 through February 27. The testimony of Ross and his father, presi-

dent of the Carolina Fire Equipment Company, showed that Ross had gone to Southport to a job site on February 26; that Ross spent the night of February 26 in a Wilmington hotel, checked out on February 27, went to nearby Southport and did a 10 to 12–hour wiring job, and then drove home, arriving near daybreak on February 28. Southport is five legal hours of driving time from Charlotte.

The evidence was in sharp conflict; defendants' evidence showed Copeland had a motive to cooperate with the prosecution; Ross and his witnesses sharply contradicted all the essential facts in the prosecution's case.

Credibility was the major issue.

Against that background, the prosecuting attorney was allowed to ask, over consistent objection, the following grossly prejudicial questions:

Q. Now, then Mr. Ross, on the 3rd day of January, 1975, I'll ask you, sir, if you did not have in your possession in your house in your room a zip–locked bag containing a total of 145 milligrams of white powder, that being cocaine?

MR. WHITFIELD: OBJECTION.

COURT: OVERRULED.

DEFENDANT'S EXCEPTION # 16.

A. No, sir.

Q. You deny that Officer M. B. Hinson came into your house on that date, searched your room and found that quantity of cocaine? Do you deny that, sir?

MR. WHITFIELD: OBJECTION.

COURT: OVERRULED.

DEFENDANT'S EXCEPTION # 17.

A. I don't deny that he came into my house and he found something, but I don't know where he found it but he didn't find it in my room. If he did, I didn't put it there.

Q. I'll ask you also, sir, if found in your room, the back left master bedroom, also was not a plastic bag containing 3.46 grams of white powder analyzed to be methylenedioxy amphetamine, commonly known as MDA?

MR. WHITFIELD: OBJECTION.

COURT: OVERRULED.

DEFENDANT'S EXCEPTION # 18.

A. No, sir.

Q. Do you deny that that was found in your room on that date at approximately 1310 hours, that being 1:10?

MR. WHITFIELD: OBJECTION.

A. I was not there, so I can't say where it was found.

COURT: OVERRULED.

DEFENDANT'S EXCEPTION # 19.

MR. WHITFIELD: Judge, the defendant, may it please you, sir, is answering these questions. The District Attorney is badgering. He has no right to do that, sir.

COURT: OVERRULED.

COURT: Go ahead.

DEFENDANT'S EXCEPTION # 20.

Q. I'll ask you, sir, if in that same room, your room, was not also found five plastic bags containing a tan powder analyzed to be 3, 4 methylenedioxy amphetamine, commonly known as MDA?

OBJECTION.

OVERRULED.

DEFENDANT'S EXCEPTION # 21.

A. No, sir.

Q. You deny that?

OBJECTION. OVERRULED.

DEFENDANT'S EXCEPTION # 22.

A. Yes, sir.

I just said I don't know where it was found. I wasn't there. There was nobody in the home at that time, so I don't know where it was found. I deny also that found in my room was a plastic bag containing a green vegetable material, analysis showing that material to contain marijuana. I wasn't there so I don't know where it was found.

Q. I'll ask you also, sir, if it was not found in your room at that same time a zip-locked bag containing two aluminum foil packages of powder, those packages containing 3, 4 methylenedioxy amphetamine, what is commonly called MDA?

MR. WHITFIELD: OBJECTION. I think he has answered that several times.

COURT: Is this a different count?

MR. COFFIELD: Yes, sir, that's a different piece of material.

COURT: OVERRULED.

DEFENDANT'S EXCEPTION # 23.

A. Would you ask that again, sir?

Q. I'm asking you, sir, if you understand and know that found in your room were two aluminum foil packages contained in a zipped-locked bag, those packages containing 3, 4 methylenedioxy amphetamine. Do you understand that?

OBJECTION.

OVERRULED.

DEFENDANT'S EXCEPTION # 24.

A. I understand the question. No, sir, I don't remember it.

Q. You, of course, do not deny that they were found in your room, do you?

OBJECTION.

OVERRULED.

DEFENDANT'S EXCEPTION # 25.

A. Yes, I do. To my knowledge, I deny it.

Q. I'll ask you, sir, if on the third day of January, 1975, if found in your room, pursuant to a search warrant, was 15.67 grams of a green vegetable material, that material being marijuana?

MR. WHITFIELD: OBJECTION as to that question.

COURT: OVERRULED.

DEFENDANT'S EXCEPTION # 26.

Q. Was it found in your room, sir?

OBJECTION.

OVERRULED.

DEFENDANT'S EXCEPTION # 27.

A. I don't know. To my knowledge, it couldn't have been.

Q. I'll ask you, sir, if on the third day of January, 1975, if found in your room was a zipped-locked bag containing a mottled orange tablet, that tablet analyzed as containing phencyclidine, otherwise known as PCP?

MR. WHITFIELD: OBJECTION.

COURT: OVERRULED.

DEFENDANT'S EXCEPTION # 28.

A. No, sir.

Q. Is what you're telling this jury, sir, that you deny it being found there because you don't have any knowledge of it? Is that what you're saying?

OBJECTION. OVERRULED.

DEFENDANT'S EXCEPTION # 29.

A. Yes, sir.

Q. So you really have no basis for the denial on what you have stated in this courtroom. Is that right?

OBJECTION. OVERRULED.

DEFENDANT'S EXCEPTION # 30.

A. Just the same thing I have said. I wasn't there so I don't know whether it was found in my room or not.

Q. Are you telling us, sir, that this grocery store full of drugs was planted there by the Mecklenburg County Vice Squad?

MR. WHITFIELD: Well, OBJECT to that question and MOVE TO STRIKE.

COURT: All right. Sustained.

Q. Are you saying, sir, that the police department planted these drugs on you in order to get you? Is that what you're telling us?

A. No, sir.

MR. WHITFIELD: OBJECT to that question.

COURT: OVERRULED.

DEFENDANT'S EXCEPTION # 31.

A. I've said nothing of the sort.

Q. Are you saying that someone else planted those drugs on you in order to get you?

MR. WHITFIELD: OBJECTION.

COURT: OVERRULED.

DEFENDANT'S EXCEPTION # 32.

Q. Is that what you're telling this jury?

OBJECTION. OVERRULED.

DEFENDANT'S EXCEPTION # 33.

I didn't say anybody planted them on me. I just said I don't know anything about them being there. I was living in my house in January of 1975.

Q. Mr. Ross, on 3 January, 1975, you owned a green fatigue jacket, did you not? Be very careful with your answer, sir?

MR. WHITFIELD: OBJECTION to that.

COURT: Sustained. I'll instruct the jury to disregard that statement of the District Attorney. Strike it from your mind and do not consider it. You may rephrase your question.

Q. On 3 January, you owned a green fatigue jacket, did you not, sir?

OBJECTION. OVERRULED.

DEFENDANT'S EXCEPTION # 34.

I never owned a green fatigue jacket. I don't know why it was found in my closet. I used that closet.

Q. Is the reason that you're denying your ownership of a green fatigue jacket because 1900 grams of MDA were found in it?

MR. WHITFIELD: OBJECTION.

COURT: OVERRULED.

A. No, Sir.

DEFENDANT'S EXCEPTION # 35.

A. I'm just saying that I didn't own a green fatigue jacket. I don't know what was found in it.

I had a dresser in that room. There were some clothes of mine in that dresser. I pulled my clothes out of that dresser on a regular basis fairly regularly when I didn't live out of the suitcase. I lived out of my suitcase in my own home lots of times because I was in and out of town so much.

Q. But you're telling this jury that the plastic bag with 3.46 grams of white powder and listed to be methylenedioxy amphetamines escaped your notice when it was in the top drawer of your dresser. Is that right?

MR. WHITFIELD: OBJECTION.

COURT: OVERRULED.

DEFENDANT'S EXCEPTION # 36.

A. I suppose so, yes, sir. I didn't see it.

Q. And likewise you're telling us that the 2 aluminum foil wrappers containing the three grams of 3, 4 methylenedioxy amphetamine found in the second drawer of your dresser also escaped your notice. Is that correct, sir?

MR. WHITFIELD: OBJECTION.

COURT: OVERRULED.

DEFENDANT'S EXCEPTION # 37.

A. Yes sir.

Q. Likewise to the plastic bag containing 15.46 grams of marijuana in the third drawer. Is that right, sir?

MR. WHITFIELD: OBJECTION.

A. Yes, sir.

COURT: OVERRULED.

DEFENDANT'S EXCEPTION # 38.

Q. Do you also deny, Mr. Ross, that the five yellow tablets marked Roach # 5 Valium were found in your dresser on 3 January, 1975?

MR. WHITFIELD: OBJECTION.

COURT: OVERRULED.

DEFENDANT'S EXCEPTION # 39.

A. That's a possibility, sir.

Q. So you admit that Valium was found in your dresser.

MR. WHITFIELD: OBJECTION.

COURT: OVERRULED.

DEFENDANT'S EXCEPTION # 40.

A. I don't know if it was found.

Q. You knew it was there but you escaped noticing all the other controlled substances in addition to the Valium that were in your dresser. Is that right?

MR. WHITFIELD: OBJECTION.

COURT: OVERRULED.

DEFENDANT'S EXCEPTION # 41.

A. I did not say it was in my dresser. I said it's possible that it was there.

Q. How about four yellow capsules marked 18904, Tuinol, found in the dresser? Is it possible that you remember those being there on 3 January, '75, sir?

MR. WHITFIELD: OBJECTION.

COURT: OVERRULED.

DEFENDANT'S EXCEPTION # 42.

A. No, sir.

Q. You don't deny, of course, that they were found there, do you?

MR. WHITFIELD: OBJECTION.

COURT: OVERRULED.

DEFENDANT'S EXCEPTION # 43.

A. Like I said, I wasn't there. I don't know what was found there unless I stood there and watched somebody.

Q. You found out subsequently?

MR. WHITFIELD: OBJECTION.

COURT: OVERRULED.

DEFENDANT'S EXCEPTION # 44.

A. Yes sir. I found out that something was found in my house. I didn't find out where it was.

I said that the reason that I thought I was a target of an investigation for sale and delivery of controlled substances was the fact that an SBI agent named Ross lived down the street from me. I don't know that it was just me. I believe it was my house instead of just me.

The result of the prosecution that was levied against me in the District Court was that the search was held to be unlawful. I was present. I remember that an officer was in my house illegally.

Q. I ask you, sir, not for your legal opinion but for your remembrance of the testimony downstairs, and let's try again. Do you remember that the case was considered an illegal search by a District Court Judge because an officer put his hand on the door knob and twisted it too soon, even though he had a valid search warrant? Do you remember that?

MR. WHITFIELD: Well, object to that.

COURT: SUSTAINED.

Q. It didn't occur, never mind, strike that. Was a picture made of you at the time of your arrest?

MR. WHITFIELD: OBJECTION.

COURT: OVERRULED.

DEFENDANT'S EXCEPTION # 45.

A. Yes, sir.

REDIRECT EXAMINATION:

The questions asked of me at great length by the District Attorney were the subject of an arrest in January, 1975, and I hired a lawyer and went to Court. The Court ruled that the search of my house was unlawful, as well as all the things that the District Attorney mentioned. I told the District Attorney that they were not my property and had no knowledge of them. That the only thing that could have possibly been in the room was Valium, as I had a prescription for Valium. I went to the doctor because I was nervous and real tense and all about my work at that time, and he gave me a prescription for Valium that I got in November.

We had credit cards through arrangements by my company for gas purchases while on the road. We had Gulf, American, and Union '76. Any gas that went into any of the vehicles was normally purchased on the credit card and the credit card slips

were just turned into the office and they were never put in the expense report. They were paid directly by the office, and the only thing that went into the expense report as for gas would have been a cash ticket when we paid for it out of the pocket.

I said to any of my relatives about the people who lived in that house that the people living there, if they brought friends in, all of which I wasn't real happy with but didn't think I had a lot of room to say anything about them, that it was not long after the arrest that my house went up for sale, very soon after that. One of the roommates that I had that I thought might have been the leading cause of this arrest moved out a week later and the house was put up for sale. I was hoping that they could sell it so I could move somewhere by myself. I chased Jeff Copeland out of the house because I saw drugs on the table and because I didn't want him in my house. I knew that he was trouble and I didn't care to have him around. I had been in enough trouble.

Defendant was convicted; he appealed; the conviction was affirmed by the Supreme Court of North Carolina, partly upon the basis that the record does not show that the dismissal of the January 1975 charges against petitioner was based upon federal constitutional reasons.

At the hearing before this court there were several significant developments:

1. The prosecuting attorney in the Superior Court, Mr. Coffield, testified that he knew the prosecution based upon the January 1975 charge had been dismissed because the search was illegal, but he decided that the judge was wrong in that respect and asked the questions anyhow.

2. The prosecutor denied knowledge that under North Carolina law his examination for impeachment must be confined to matters within the knowledge of the witness, despite the fairly recent case, *State v. Williams*, 279 N.C. 663, 185 S.E.2d 174 (1971), in which then Chief Justice Bobbitt clearly held the law to be that such questions must relate to matters within the knowledge of the witness.

3. Testimony at the evidentiary hearing in this court made it clear that the reason the trial judge dismissed the prosecution based upon the January 1975 incident was that the search itself was illegal.

4. The hearing before this court made it obvious that counsel defending petitioner in the Superior Court trial went as far as he thought he could in registering objections to the improper cross–examination without running the risk of contempt.

The dissenting opinion of North Carolina Supreme Court Justice Exum is eloquent. It includes the following:

"The impropriety of this form of cross–examination is obvious. To inquire of defendant what some other person might have found in his room in a house where he and others were living is not, first of all, an inquiry concerning defendant's misconduct. Defendant would be guilty of misconduct only if he knowingly possessed these controlled substances.[1]

"[1.] The fact that these substances might have been found in defendant's room would, of course, be some evidence that he knowingly possessed them if defendant were on trial for these earlier possessions. The point is that defendant was *not* on trial for these possessions. When cross–examining a witness for impeachment purposes the examiner is bound by the witness' answers, although the cases permit some 'sifting' of the witness. *State v. Currie*, 293 N.C. 523, 238 S.E.2d 477 (1977); *State v. Fountain*, 282 N.C. 58, 191 S.E.2d 674 (1972). Such cross–examination must not, however, be permitted to evolve into a mini-trial on the question of defendant's guilt of the collateral misconduct. *See State v. Monk*, 286 N.C. 509, 517, 212 S.E.2d 125, 132 (1975); I Stansbury's North Carolina Evidence § 112 (Brandis rev. 1973). It did so evolve in this case to the prejudice of defendant."

Second, the inquiry related to matters not within the knowledge of the defendant and were framed in such a way that defendant could not appropriately respond. The questions were not propounded in good faith. The cross–examination was a calculated attempt by the prosecutor to get before the jury evidence supplied by the questions themselves rather than by the witness' responses. Finally, this cross–examination inquired into criminal charges of which the defendant

had earlier been acquitted and amounted to no more than questions about prior criminal accusations.

"This kind of cross–examination was condemned in *State v. Williams*, 279 N.C. 663, 185 S.E.2d 174 (1971). In a carefully considered opinion by Chief Justice Bobbitt, the Court overruled earlier cases which permitted cross–examination of a defendant regarding past accusations of crime. The Court concluded, 279 N.C. at 675, 185 S.E.2d at 181:

"'It is permissible, for purposes of impeachment, to cross–examine a witness, including the defendant in a criminal case, by asking disparaging questions concerning collateral matters relating to his criminal and degrading conduct. *State v. Patterson*, 24 N.C. 346 (1842); *State v. Davidson*, 67 N.C. 119 (1872); *State v. Ross*, 275 N.C. 550, 553, 169 S.E.2d 875, 878 (1969). Such questions relate to matters *within the knowledge of the witness*, not to accusations of any kind made by others. We do not undertake here to mark the limits of such cross–examination except to say generally (1) the scope thereof is subject to the discretion of the trial judge, and (2) the questions must be asked in good faith.' (Emphasis original.)

"Cross–examination of a defendant regarding his past use of heroin was sustained in *State v. McAllister*, 287 N.C. 178, 184, 214 S.E.2d 75, 81 (1975), because 'the questions related to the matters within the knowledge of the witness, not to accusations of any kind made by others, and were competent for the purpose of impeachment.'

"Nor do I believe this Court has carried this impeachment rule so far as to permit cross–examination about past criminal conduct for which a defendant has been tried and acquitted. The majority would extend the rule this far. I cannot agree to such an extension. The Court of Appeals has correctly held that a witness may not be impeached by cross–examination relating to a controlled substance charge which was later dismissed. *State v. Sharratt*, 29 N.C.App. 199, 223 S.E.2d 906 (1976), *cert. denied*, 290 N.C. 554, 226 S.E.2d 512 (1976), relying on *State v. Williams, supra*.

"The kind of tactic used here by the prosecutor was considered at length in *State v. Phillips*, 240 N.C. 516, 82 S.E.2d 762 (1954). In *Phillips* the prosecutor persisted in asking the defendants on cross-examination about various prior acts of misconduct which they consistently denied having committed. The court characterized the cross–examinations as an attempt by the state to put before the jury through its questions 'supposed facts of which there is no evidence' and found the tactic sufficiently prejudicial to warrant a new trial. The questions put to the defendant in the case *sub judice* were even more vicious than those in *Phillips*. At least in *Phillips* the defendants could either admit or deny the accusations of the prosecutor. Here, however, the questions were asked about matters which defendant could neither admit nor deny. Defendant argues in his brief:

"'The defendant respectfully contends that there is a clear distinction between asking a defendant about previous degrading acts of conduct, or of matters within his own knowledge, and in asking questions with regard to activities of the police outside of the presence of the defendant, and in which the defendant took no part, and of which the defendant had no personal knowledge.'

"I fully agree and believe our cases require us to concede the correctness of this argument. Defendant should be granted a new trial.

"Chief Justice Sharp and Justice Lake join in this dissenting opinion."

I will not try to repeat the matters stated so clearly by Justice Exum.

I do conclude from this record that:

1. The cross–examination was highly prejudicial in that the impeachment questions were not related to matters within the petitioner's own knowledge and were not asked in good faith. The questions were an

attempt by the prosecution to get inadmissible evidence before the jury.

2. Strenuous and timely objections were lodged and preserved by petitioner's trial counsel.

3. The cross–examination was an improper use of suppressed materials, in violation of *Agnello v. United States*, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925).

4. The questions violated due process of law because the charges to which the questions related had been dismissed, they were unrelated to matters within the petitioner's knowledge and they were not asked in good faith. *See Foster v. Watkins*, 423 F.Supp. 53 (W.D.N.C.1976).

5. There has been no procedural default by appellant petitioner. He has raised all the factual questions and all the legal questions necessary to protect his Fourth Amendment rights.

6. The conviction was obtained by violation of petitioner's constitutional rights.

IT IS THEREFORE ORDERED that the conviction be and it is hereby set aside. Respondents are directed to allow petitioner to be at liberty pending decision by the respondents whether or not to try the case again. Such re–trial, if one is to be had, shall take place within a reasonable time.