Robert J. DAVIS, Carnell Graves, Richard J. Graves, Vickie Ann Graves, Meredith D. Graves, Debra M. Graves and Kevin R. Graves, minors, by their father and next friend, Floyd Graves and Lorene Joshua, Appellants,

v.

BOARD OF EDUCATION OF the NORTH LITTLE ROCK, ARKANSAS, SCHOOL DISTRICT, a public body corporate, and F. B. Wright, Superintendent of Schools of the North Little Rock School District, Appellees.

No. 81–1875.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 14, 1982.

Decided March 23, 1982.

Robert V. Light, Little Rock, Ark., for appellees; Herschel H. Friday, Little Rock, Ark., of counsel.

John W. Walker, Little Rock, Ark., for appellants.

Before BRIGHT, ROSS and STEPHENSON, Circuit Judges.

STEPHENSON, Circuit Judge.

The Board of Education of the North Little Rock School District sought permission from the district court to revise its desegregation plan. The Board wished to close one of its schools in order to ease administrative problems caused by declining enrollment and decreased funding. This motion was opposed on the grounds that it would place a disproportionate transportation burden on black students and because it would mean the closing of the only junior high in a black neighborhood. The district court, 502 F.Supp. 108,[1] approved the proposed closing. We affirm.

## I. PROCEDURAL OVERVIEW

The original complaint in the North Little Rock school desegregation case was filed in August 1968. Since that time, there has been ongoing litigation concerning, first, the nature of the desegregation plan to be adopted and, second, whether the plan has been faithfully implemented by the District and what revisions the District may properly install. *See Graves v. Board of Education,* 299 F.Supp. 843 (E.D.Ark.1969); *Graves v. Board of Education,* 302 F.Supp. 136 (E.D.Ark.1969); *Davis v. Board of Education,* 328 F.Supp. 1197 (E.D.Ark.1971), *modified on appeal,* 449 F.2d 500 (8th Cir. 1971) (en banc); *Davis v. Board of Education,* 362 F.Supp. 730 (E.D.Ark.1973); *Davis v. Board of Education,* 635 F.2d 730 (8th Cir. 1980), *cert. denied,* —— U.S. ——, 102 S.Ct. 413, 70 L.Ed.2d 223 (1981).

This is the third time that this suit has been before this court. On the first occasion our en banc court approved the desegregation plan adopted by the district court. The opinion clearly envisaged that on remand the district court was to retain jurisdiction. *Davis v. Board of Education, supra,* 449 F.2d at 502. In this case's second trip to the court of appeals this court determined that certain changes in student transportation and in employment, assignment and dismissal of faculty and staff were required. Again, the district court was instructed to retain jurisdiction until such time as the North Little Rock School District is thoroughly integrated. *Davis v. Board of Education, supra,* 635 F.2d at 733.

In May 1981, defendant Board of Education filed the motion which led to this appeal. The Board sought approval to close the present seventh grade center which was housed in the building known as the Jones School. The motion and an accompanying document stated that enrollment in the seventh, eighth and ninth grades had declined 781 students, from 3170 in 1971, when the desegregation plan was imposed, to 2389 students for the 1980–81 school year. The motion maintained that the closing of the Jones School was educationally sound because of the decline in enrollment and economically prudent because reductions in federal and state aid had forced the Board to reduce its budget by approximately $1 million.

The intervenor-plaintiff resisted this motion and asserted, in relevant part, that (1) the proposed closing would materially alter the desegregation plan "in that it will further burden black children who are already disproportionately burdened insofar as transportation is concerned," (2) the closing of the Jones School represented the School Board's "bad faith" in the way it had conducted desegregation in North Little Rock. Essentially, the plaintiff asserts that the school was adequate prior to desegregation and that the Board had an obligation to adequately maintain the Jones School.

A one-day hearing on the motion was held. George Miller, Superintendent of Schools; Andrew Power, Assistant Superintendent and George Stancil, President of the Board of Education, all testified in sup-

---

1. The Honorable Henry Woods, United States District Judge for the Eastern District of Arkansas, presiding.

port of the motion. Power and Stancil are black. The appellants produced only one witness, plaintiff-intervenor Lorene Joshua. Joshua only gave testimony concerning her legal standing in this case. Following the hearing, the district court concluded:

> The testimony of the movants amply supported their position that the District is faced with a budget reduction of $1,150,-000; that the closing of Central would save the district approximately $340,000; that the Poplar Street facility is a more desirable site from the standpoint of physical facilities and location, and that it would require less maintenance and security costs. While it is true that slightly more blacks than whites (120 against 93) would be bused under the proposed plan than were bused in the 1980–81 school year, we do not regard these figures as significant or unduly impacting upon the black children.

This appeal followed. A stay pending appeal was denied.

## II.  FACTUAL BACKGROUND

The decision to close the Jones School affects the students in grades seven, eight and nine. The "Storm" plan, see *Davis v. Board of Education, supra,* 449 F.2d at 501,

n.2, utilized five separate buildings to handle these three grades. Central Junior High, formerly located in the building known as the Jones School, was the seventh grade center. The seventh grade center was the school for all the seventh graders in the North Little Rock School District. Four other schools (Poplar Street, Ridge Road, Lakewood and Rose City) served the students in eighth and ninth grades. The Board's proposal closed the Jones School, shifted the seventh graders to the Poplar Street school and used the remaining three schools for eighth and ninth grade students.

The Jones School was located in the Dixie Addition of North Little Rock. It was the only junior high building in a black neighborhood.[2] The main building of the Jones School was built in 1952. The gymnasium was built in the early 60s: The Jones School consists of three other buildings. Two were built with used lumber. The third is a "real old" elementary school.

The Poplar Street School is north and west of Jones but is still centrally located.[3] It is in a racially mixed neighborhood. Poplar Street was built shortly after World War II.

---

**2.** Judge Shell described the geographical framework of the desegregation plan as follows:

> A brief explanation of the operation of the Storm Plan at the secondary level is required. Utilizing a very simplified approach, the city of North Little Rock can be graphically viewed as a rectangle. Along the southern border the Arkansas River runs in an easterly direction, separating the city of Little Rock from North Little Rock. Interstate Highway 40 bisects the rectangle, running along an east-west line roughly parallel to the Arkansas River. Interstate Highway 30 intersects, but does not cross, Interstate Highway 40 at a point which, for the purposes of this description, can be considered the geographical center of the city. Interstate 30 leads south from Interstate 40 and crosses the Arkansas River into Little Rock. Most of the black population of North Little Rock live in the southern half of the city between the Arkansas River and I-40. The Dixie Addition is located to the south of Interstate 40 and to the east of Interstate 30.
>
> The geographical attendance zones for the two high schools maintained by the district are defined by a north-south line bisecting the city into eastern and western divisions.

Interstate 30 serves as the divider between these two zones in the southern half of the city. Ole Main High School (formerly known as North Little Rock High) is centrally located south of I-40 and west of I-30, a short distance from their intersection. Northeast High School, as the name implies, is located north of I-40 and east of I-30. It is not considered centrally located. Lakewood Junior High shares a campus with Northeast High School.

> Prior to 1969 the school district maintained the Scipio A. Jones High School in the Dixie Addition. Jones High was attended by black students only. With the advent of the Storm Plan, Jones was converted to a school for all seventh grade students in the district and renamed Central Junior High, commonly referred to as the seventh grade center.

*Davis v. Board of Educ.,* slip op. at 3–4, No. LR–68–C–151 (E.D.Ark., Sept. 13, 1977).

**3.** The Poplar Street school is located just south and west of the intersection of I-40 and I-30. It is very near the Ole Main High School. *See* n.2, *supra.*

The three remaining junior high buildings are near the outer boundaries of the school district and could not be classified as centrally located.

The School Board's evidence indicated that it considered closing each of the five schools when it was clear that one school would have to be eliminated. However, they only seriously evaluated the consequences of closing the Jones or the Poplar Street schools. The list was limited to these two schools, according to the officials' testimony, because the Board and the administration believed a central location was vital for a school which all the seventh graders in the district would attend.

A study submitted to the School Board reported that the annual cost of operating and maintaining the Jones School was significantly higher than that incurred at Poplar Street. The cost to run Poplar Street was about $70,000 while the Jones School operation expense was approximately $120,-000.[4] The study also stated that "needed repairs within five years" at Jones would cost about $2.1 million while at Poplar Street the estimated expense was only $93,-000.

Superintendent Miller also produced a report which compared the number of white and black students that would be transported if five schools were used for seventh through ninth grades with the number bused if Jones was closed. This report stated that 120 more blacks and 93 more whites were transported if the Jones School closing was approved.[5] Further, Superintendent Miller testified that the closing of Jones would save the District $340,000. He stated that this amount came from a reduction in costs of "staff, supplies, equipment and utilities." Miller was not able to provide details to support this claimed savings nor was

he able to produce figures on how much would be realized if one of the other junior high buildings was closed.

## III. DISCUSSION

█ It is beyond debate that the burden of desegregation should be shared as equally as possible between blacks and whites, *Davis v. Board of Education, supra,* 635 F.2d at 731–32; *Clark v. Board of Education,* 449 F.2d 493, 496, 499 (8th Cir. 1971) (en banc), *cert. denied,* 405 U.S. 936, 92 S.Ct. 954, 30 L.Ed.2d 812 (1972), and that any part or revision of a desegregation plan should be judged on the basis of whether it contributed to the establishment of a unitary system of education. *See Milliken v. Bradley,* 433 U.S. 267, 279–82, 97 S.Ct. 2749, 2756–58, 53 L.Ed.2d 745 (1977).

█ The application of these general principles is more difficult than merely stating them. The Tenth Circuit has listed the following factors which should be evaluated in such cases:

(1) the existence of valid nonracial educational reasons for closing school facilities located in predominantly black areas; (2) the condition and adequacy of the facilities at the school being closed; (3) whether the facilities to which the minority students were being transferred were adequate and whether the transfer would cause those facilities to be "overtaxed"; (4) whether the primary or sole reason for the school board's action was the fear that less constitutionally suspect solutions to segregation would lead to "white flight" from the school district; (5) whether the entire or primary burden of integration is placed on black students and teachers; and (6) whether the school board considered alternatives which did

4. The sub-totals of the operation and maintenance expenses were broken down as follows:

| | Jones | Poplar Street |
|---|---|---|
| Maintenance Repairs 1980–81 | $17,614 | $17,125* |
| Annual Electric and Gas Costs | 28,000 | 18,000 |
| Security—Annual | 3,204 | 864 |
| Custodians | 72,000 | 40,000 |
| Totals | $120,818 | $75,989 |

* Includes $5,000 paving expense, a non-recurring cost for next ten years.

5. The total number of students in the North Little Rock school system is approximately 10,-000. Blacks represent about 31% of this total.

not require the closure of predominantly black schools before making a final decision. * * * No one of these factors, standing alone, is necessarily determinative.

*Fitzpatrick v. Board of Education*, 578 F.2d 858, 861–62 (10th Cir. 1978) (citations omitted). We would add to this list that economic, as well as educational reasons, should be considered but that financial considerations cannot be dispositive.

■ Reviewing the factors which are relevant in this case demonstrates that there are valid nonracial reasons for the closing of Jones. The declining enrollment and decreased funding made closing of one of the five schools a prudent action to take. The decision to select a centrally located school is likewise supportable for nonracial reasons. Because the seventh grade center serves all the seventh graders in the district, a central location is a logical method to reduce transportation time and costs.

The projected expense at Jones for repairs in the next five years suggests that the condition of Jones is less attractive than Poplar Street. There is no evidence in the record to suggest that Poplar Street will be overtaxed by this shift of students. Further, the burden of integration will not be substantially altered from the original desegregation plan as approved by this court in 1971. Testimony at the hearing also demonstrates that the School Board considered an alternative which did not require the closing of a predominantly black school. Initially the administration considered closing each of the five junior highs but eventually narrowed the selection to the two centrally located schools. In sum, this decision to close Jones apparently represents a substantial financial savings while meaning

only a slight, if any, increased burden on black children. It was not an abuse of discretion for the district court to approve this decision.

It is somewhat misleading to state that the problem in this case concerns the closing of a "black" school. While Jones is in a predominantly black neighborhood and prior to desegregation it was an all-black school, since 1971 it has served as the school for all the seventh graders in the district. In the 1980–81 school year, for example, 561 white students compared with 221 black students attended Jones. Thus, it was a school for both black and white students for the last ten years. The real problem here is that the children in the black neighborhood surrounding Jones will lose a walk-in neighborhood school. Our opinion in this case should not be interpreted as minimizing this interest. Nor should it be thought that school districts, many of which will face similar problems of declining enrollments and monies, can close schools with impunity.

In school districts where a finding of de jure discrimination has been made and a desegregation plan is in effect the burden is upon the district to demonstrate that the motivation for the school closing is not racial. *See Haney v. County Board of Education*, 429 F.2d 364, 372 (8th Cir. 1970). This should be done through the use of objective evidence to show the need for the proposed closing, what other alternatives were considered and why they were rejected.

In the case at bar this test has been substantially satisfied. The additional transportational burden caused by the closing of Jones is minor and the basic elements of the plan approved in 1971 remain intact.[6]

---

6. The district court wrote:
The racial makeup of the three eighth-ninth grade junior high schools in new attendance zones drawn and approved by the Board would be as follows:

Ridgeroad
    white 450
    black 176
        626      28.1 percent minority

Lakewood
    white 374
    black 169
        543      31.1 percent minority

Rose City
    white 284
    black 157
        441      35.6 percent minority

Since the racial makeup of the district is approximately 70% white and 30% black,

The defendant School Board also raises the related issues of standing and whether the suit should be dismissed because it does not present a "case or controversy" within the meaning of Article III.

Concerning standing the School Board stresses that the plaintiff-intervenor Joshua, who was allowed to intervene in 1977, does not have children in the seventh, eighth, or ninth grades and thus does not have standing regarding the issue before the court because only those three grades are affected. This argument is without merit. The record indicates that Joshua has three children in the North Little Rock school system; in second, fifth and tenth grades. Just as the original plaintiffs in this case were not required to have children in every grade, the present plaintiff need not have children in the specific grades which are at issue in this case. It is enough that Joshua has children in the school system. This motion by the School Board is not a separate lawsuit but is part of the continuing process to establish a completely unitary system of public education in North Little Rock. Our two earlier opinions clearly stated that the district court was to "retain jurisdiction until such time as the North Little Rock School District is thoroughly integrated." *Davis v. Board of Education, supra*, 635 F.2d at 733. *See Davis v. Board of Education, supra*, 449 F.2d at 502. Thus, the issue is not whether Joshua has standing with regard to the seventh, eighth and ninth graders which the closing of Jones will have an impact upon but whether she, on behalf of her children, has standing with regard to the entire desegregation suit concerning the North Little Rock school system. We think it is clear that she does.

The School Board further maintains that no case or controversy exists because no class has been certified and because the case has been moot since the desegregation plan was implemented in 1972. They rely upon Justice Rehnquist's dissent to the

United States Supreme Court denial of certiorari in the last appeal before this court. *Davis v. Board of Education*, —— U.S. ——, 102 S.Ct. 413, 70 L.Ed.2d 223 (1981). It is our view that the requirements of Article III are satisfied. The district court has been instructed to maintain jurisdiction until full integration is achieved. The School Board, pursuant to this directive, has sought permission of the district court before implementing major changes in school facilities or programs. For example, in 1976, the school board sought approval to renovate two elementary school buildings and another building at one of the high schools. The initial motion in this case is another example of the court's continuing jurisdiction over desegregation of the North Little Rock schools. This case should not be dismissed and a case or controversy sufficient to satisfy Article III will exist until such time as the district court determines that a unitary system of education has been achieved and the North Little Rock School District is thoroughly integrated.

As the Fifth Circuit has stated, "a school system is not automatically desegregated when a constitutionally acceptable plan is adopted and implemented." *United States v. Texas Education Agency*, 647 F.2d 504, 508 (5th Cir. 1981). *See Pate v. Dade County School Board*, 588 F.2d 501, 504 (5th Cir.) (per curiam), *cert. denied*, 444 U.S. 835, 100 S.Ct. 67, 62 L.Ed.2d 44 (1979) ("[we have recognized] that the district court has a continuing responsibility to appraise the system in the light of actual conditions and experience and make required changes to assure the maintenance of a unitary system"); *Thompson v. Madison County Board of Education*, 496 F.2d 682, 686–87 (5th Cir. 1974).

Affirmed.

the plan fully comports with prior decisions of the District Court and the Court of Appeals in the instant case.

*Davis v. Board of Educ.*, slip op. at 1–2, No. LR–68–C–151 (E.D.Ark. August 7, 1981).